IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ADRIAN DIECKMAN, on behalf of himself and all others similarly situated, | § § § § | |
| | § | No. 208, 2016 |
| Plaintiff Below, Appellant, | § § | |
| | § | Court Below—Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| REGENCY GP LP, REGENCY GP | § | C.A. No. 11130 |
| LLC, ENERGY TRANSFER | § | |
| EQUITY, L.P., ENERGY | § | |
| TRANSFER PARTNERS, L.P., | § | |
| ENERGY TRANSFER | § | |
| PARTNERS,GP, L.P., MICHAEL J. | § | |
| BRADLEY, JAMES W. BRYANT, | § | |
| RODNEY L. GRAY, JOHN W. | § | |
| McREYNOLDS, MATTHEW S. | § | |
| RAMSEY and RICHARD | § | |
| BRANNON, | § | |
| | § | |
| Defendants Below, Appellees. | § | |

Submitted: November 16, 2016
Decided: January 20, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery: **REVERSED**.

Stuart M. Grant, Esquire (*argued*) and James J. Sabella, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware; Mark Lebovitch, Esquire, Jeroen van Kwawegen, Esquire and Alla Zayenchik, Esquire, Bernstein Litowitz Berger & Grossman LLP, New York, New York; Mark C. Gardy, Esquire and James S. Notis, Esquire, Gardy & Notis, LLP, New York, New York, for Plaintiff, Appellant, Adrian Dieckman.

Rolin P. Bissell, Esquire and Tammy L. Mercer, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Michael Holmes, Esquire (*argued*), Manuel Berrelez, Esquire and Craig Zieminski, Esquire, Vinson & Elkins LLP, Dallas, Texas for Defendants, Appellees, Regency GP LP, Regency GP LLC, Energy Transfer Equity, L.P., Energy Transfer Partners, L.P., Energy Transfer Partners, GP, L.P., Michael J. Bradley, Rodney L. Gray, John W. McReynolds and Matthew S. Ramsey.

David J. Teklits, Esquire and D. McKinley Measley, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; M. Scott Barnard, Esquire, Michelle A. Reed, Esquire and Matthew V. Lloyd, Esquire, Akin Gump Strauss Hauer & Feld LLP, Dallas, Texas for Defendants, Appellees, James W. Bryant and Richard Brannon.

**SEITZ**, Justice:

In this appeal, we again wade into the details of a master limited partnership agreement to decide whether the complaint's allegations can overcome the general partner's use of conflict resolution safe harbors to dismiss the case. The parties are identified by a host of confusing abbreviations, but the gist of the appeal is as follows.

The plaintiff is a limited partner/unitholder in the publicly-traded master limited partnership ("MLP"). The general partner proposed that the partnership be acquired through merger with another limited partnership in the MLP family. The seller and buyer were indirectly owned by the same entity, creating a conflict of interest. Because conflicts of interest often arise in MLP transactions, those who create and market MLPs have devised special ways to try to address them. The general partner in this case sought refuge in two of the safe harbor conflict resolution provisions of the partnership agreement—"Special Approval" of the transaction by an independent Conflicts Committee, and "Unaffiliated Unitholder Approval."

In the MLP context, Special Approval typically means that a Conflicts Committee composed of members independent of the sponsor and its affiliates reviewed the transaction and made a recommendation to the partnership board whether to approve the transaction. Unaffiliated Unitholder Approval is typically just that—a majority of unitholders unaffiliated with the general partner and its

affiliates approve the transaction. Under the partnership agreement, if either safe harbor is satisfied, the transaction is deemed not to be a breach of the agreement.

The partnership agreement required that the Conflicts Committee be independent, meaning that its members could not be serving on affiliate boards and were independent under the audit committee independence rules of the New York Stock Exchange. The plaintiff alleged in the complaint that the general partner failed to satisfy the Special Approval safe harbor because the Conflicts Committee was itself conflicted. According to the plaintiff, one of the Committee's two members began evaluating the transaction while still a member of an affiliate's board, and then resigned from the affiliate's board four days after he began his review to then become a member of the Conflicts Committee. On the same day the transaction closed, the committee member was reappointed to the seat left vacant for him on the affiliate's board.

The plaintiff also alleged that the general partner failed to satisfy the Unaffiliated Unitholder Approval safe harbor because the general partner made false and misleading statements in the proxy statement to secure that approval. In the 165-page proxy statement sent to the unitholders, the general partner failed to disclose the conflicts within the Conflicts Committee. Instead, the proxy statement stated that Special Approval had been obtained by an independent Conflicts Committee.

2

The general partner moved to dismiss the complaint and claimed that, in the absence of express contractual obligations not to mislead investors or to unfairly manipulate the Conflicts Committee process, the general partner need only satisfy what the partnership agreement expressly required—to obtain the safe harbor approvals and follow the minimal disclosure requirements. In other words, whatever the general partner said in the proxy statement, and whomever the general partner appointed to the Conflicts Committee, was irrelevant because only the express requirements of the partnership agreement controlled and displaced any implied obligations not to undermine the protections afforded unitholders by the safe harbors.

The Court of Chancery side-stepped the Conflicts Committee safe harbor, but accepted the general partner's argument that the Unaffiliated Unitholder Approval safe harbor required dismissal of the case. The court held that, even though the proxy statement might have contained materially misleading disclosures, fiduciary duty principles could not be used to impose disclosure obligations on the general partner beyond those in the partnership agreement, because the partnership agreement disclaimed fiduciary duties. Further, the court agreed with the defendants that the only express disclosure requirement of the agreement in the event of a merger—that the general partner simply provide either a summary of, or a copy of, the merger agreement—displaced any implied

3

contractual duty to disclose in the proxy statement material facts about the conflicts within the Conflicts Committee.

On appeal, the plaintiff concedes that if the general partner met the requirements of either safe harbor, his breach of contract claim would fail. The plaintiff also does not argue with the Court of Chancery's ruling that the partnership agreement's express disclosure requirements cannot be supplanted by implied or fiduciary-based disclosure obligations. Instead, he argues that the Court of Chancery erred when it concluded that the general partner satisfied the Unaffiliated Unitholder Approval safe harbor, because he alleged sufficient facts to show that the approval was obtained through false and misleading statements. The plaintiff also claims that, for pleading stage purposes, he has made a sufficient showing that the Special Approval safe harbor was not satisfied, because the Conflicts Committee was not independent.

We view the central issue in the dispute through a different lens than the Court of Chancery. The Court of Chancery was correct that the implied covenant of good faith and fair dealing cannot be used to supplant the express disclosure requirements of the partnership agreement. But the court focused too narrowly on the partnership agreement's disclosure requirements. Instead, the center of attention should have been on the conflict resolution provision of the partnership agreement.

4

The partnership agreement's conflict resolution provision is a powerful tool in the general partner's hands because it can be used to shield a conflicted transaction from judicial review. But the conflicts resolution provision also operates for the unitholders' benefit. It ensures that, before a safe harbor is reached by the general partner, unaffiliated unitholders have a vote, or the conflicted transaction is reviewed and recommended by an independent Conflicts Committee.

The partnership agreement does not address how the general partner must conduct itself when seeking the safe harbors. But where, as here, the express terms of the partnership agreement naturally imply certain corresponding conditions, unitholders are entitled to have those terms enforced according to the reasonable expectations of the parties to the agreement. The implied covenant is well-suited to imply contractual terms that are so obvious—like a requirement that the general partner not engage in misleading or deceptive conduct to obtain safe harbor approvals—that the drafter would not have needed to include the conditions as express terms in the agreement.

We find that the plaintiff has pled sufficient facts, which we must accept as true at this stage of the proceedings, that neither safe harbor was available to the general partner because it allegedly made false and misleading statements to secure Unaffiliated Unitholder Approval, and allegedly used a conflicted Conflicts

5

Committee to obtain Special Approval. Thus, we reverse the Court of Chancery's order dismissing Counts I and II of the complaint.

## I.

As alleged in the complaint, the plaintiff, Adrian Dieckman, is a unitholder of Regency. The business entity defendants, their relationships, and other abbreviations are as follows:

Regency Energy Partners LP ("Regency") - a publicly-traded Delaware limited partnership engaged in the gathering and processing, contract compression, treating and transportation of natural gas and the transportation, fractionation and storage of natural gas liquids.

Regency General Partner LP ("General Partner LP") - the general partner of Regency.

Regency General Partner LLC ("General Partner LLC") - a Delaware LLC and the general partner of General Partner LP.[1]

Energy Transfer Partners L.P. ("ETP") - the general partner of Sunoco LP; a 43% owner of limited partnership interests in Sunoco and a 100% owner of Sunoco's distribution rights.

Energy Transfer Partners, GP, L.P. ("EGP") - the general partner of ETP.

Energy Transfer Equity, L.P. ("ETE") - indirectly owns Regency's general partner and ETP's general partner.

Conflicts Committee - the committee formed by the General Partner under § 7.9(a) of the LP Agreement.

---

[1] Like the Court of Chancery, for simplicity's sake we collapse General Partner LP and General Partner LLC into one as the "General Partner" of Regency, recognizing that there were two layers of general partners.

6

LP Agreement - the Regency limited partnership agreement.

The following is a diagram from the Court of Chancery opinion showing the interconnected relationships among the entities before the merger, and Regency's status after the merger:



The remaining defendants are the six members of General Partner LP's board of directors—Michael J. Bradley (also CEO of the General Partner), James W. Bryant, Rodney L. Gray, John W. McReynolds (also CFO and president of ETE), Matthew S. Ramsay, and Richard Brannon. Bryant and Brannon served on

the Conflicts Committee of the General Partner's board. Brannon was a Sunoco director until January 20, 2015, and was reappointed to the Sunoco board on May 5, 2015. Bryant was appointed to Sunoco's board on May 5, 2015.

**A.**

According to the complaint and the proxy statement distributed to unitholders,[2] the ETP and ETE boards met to discuss a merger between ETP and Regency. ETP eventually made a merger proposal to Regency, where Regency would be merged into ETP for a combination of cash and stock using an exchange ratio of 0.4044 ETP common units for one Regency common unit, and a $137 million cash payment. Because of the undisputed conflicts of interest in the proposed merger transaction, the General Partner looked to the conflict resolution provisions of the LP Agreement.

Under § 7.9(a) of the LP Agreement, entitled "Resolution of Conflicts of Interest; Standards of Conduct and Modification of Duties," unless otherwise provided in another agreement, the General Partner can resort to several safe harbors to immunize conflicted transactions from judicial review:

> [A]ny resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of

---

[2] The proxy statement incorporated into the complaint and relied on by the parties is properly considered on a motion to dismiss. *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

this Agreement … or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties, or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).[3]

The General Partner sought the protections of the safe harbors by Special Approval under § 7.9(a)(i) and Unaffiliated Unitholder Vote under § 7.9(a)(ii). Special Approval is defined in the LPA as "approval by a majority of the members of the Conflicts Committee."[4]  The Conflicts Committee must be:

[A] committee of the Board of Directors of the general partner of the General Partner[5] composed entirely of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner[,] or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.[6]

For purposes of subsection (b), "Affiliate" is defined as any person "that directly or indirectly through one or more intermediaries controls, is controlled by

---

[3] App. to Opening Br. at 105 (LP Agreement § 7.9(a)).
[4] *Id*. at 70 (LP Agreement § 1.1).
[5] The general partner of the General Partner is Regency GP LLC.  As noted before, for simplicity sake, "General Partner" in this decision includes both Regency GP LP and Regency GP LLC.
[6] App. to Opening Br. at 62 (LP Agreement § 1.1).

or is under control with, the Person in question."[7]  Sunoco and the General Partner are both controlled by ETE, and are "Affiliates," under the LP Agreement.  Thus, Sunoco board members were not eligible to serve as members of the General Partner's Conflicts Committee.  Nor was it clear that they would meet the audit committee independence rules of the New York Stock Exchange.

**B.**

The General Partner appointed Brannon and Bryant to the Conflicts Committee.  The complaint alleges that before the proposed transaction, Brannon was a Sunoco director.  On January 16, 2015, ETE appointed Brannon to the General Partner's board, while still a director of Sunoco.  The plaintiff claims that, from January 16-20, while a member of both boards, Brannon consulted informally on the proposed transaction.  According to the complaint, Brannon then temporarily resigned from the Sunoco board on January 20, and on January 22, became an official member of the Conflicts Committee when formal resolutions were passed creating the Committee.  Brannon and Bryant then negotiated on behalf of Regency with ETP and recommended the merger transaction to the General Partner.  On April 30, 2015, the day that the merger closed, Brannon was reappointed to the Sunoco board, and Bryant was also appointed to Sunoco board.

---

[7] *Id*. at 49 (LP Agreement § 1.1).

10

The complaint also alleges that the Conflicts Committee retained a conflicted financial advisor, J.P. Morgan. J.P. Morgan was supposedly chosen by Regency's CFO, Long, and not by the Conflicts Committee. Because it was allegedly known that Long was expected to become the CFO of ETP GP LLC, the plaintiff claims that J.P. Morgan was beholden to Long and would favor its long-term relationship with the Energy Transfer entities.

The plaintiff claims that the negotiations between the Conflicts Committee and ETP were ceremonial and only lasted a few days. According to the complaint, between January 23 and January 25, the Conflicts Committee made a perfunctory and slightly increased counteroffer to ETP's offer, which would have achieved a 15% premium to the closing price of common units. ETP rejected the counteroffer, and the parties settled on ETP's opening bid of a 13.2% premium to the January 23 closing price. The Conflicts Committee recommended that the General Partner pursue the transaction on the original terms proposed by ETP, which the General Partner approved on January 25. The plaintiff alleges that the entire process from start to finish lasted nine days.

## C.

The LP Agreement only required minimal disclosure when a merger transaction was considered by the unitholders—a summary of, or a copy of, the

11

merger agreement.[8]   But the General Partner went beyond the minimal requirements in the LP Agreement.  To gain Unaffiliated Unitholder Approval and the benefit of the safe harbor, the General Partner filed a 165-page proxy statement and disseminated it and a copy of the merger agreement to the unitholders.

The proxy statement stated that the "Conflicts Committee consists of two independent directors:  Richard D. Brannon (Chairman) and James W. Bryant."[9]  It also stated that the Conflicts Committee approved the transaction, and such approval "constituted 'Special Approval' as defined in the Regency partnership agreement."[10]   The proxy statement did not inform unitholders about the circumstances of Bryant's alleged overlapping and shifting allegiances, including reviewing the proposed transaction while still a member of the Sunoco board, his nearly contemporaneous resignation from the Sunoco board and appointment to the General Partner's board and then the Conflicts Committee, or Brannon's appointment and Bryant's reappointment to the Sunoco board the day the transaction closed.  At a special meeting of Regency's unitholders on April 28, 2015, a majority of Regency's unitholders, including a majority of its unaffiliated unitholders, approved the merger.

---

[8] *Id*. at 124-35 (LP Agreement § 14.3(a)).
[9] *Id*. at 215.
[10] *Id*.

**D.**

After plaintiff filed his complaint challenging the fairness of the merger transaction, the defendants moved to dismiss under Court of Chancery Rule 12(b)(6), invoking the protections of Special Approval and Unaffiliated Unitholder Approval under the LP Agreement. The Chancellor reached only the Unaffiliated Unitholder Vote safe harbor. After finding that all fiduciary duties were displaced by contractual terms, the court noted that the LP Agreement contained "just a single disclosure requirement" and thus the LP Agreement terms "unambiguously extinguish the duty of disclosure and replace it with a single disclosure requirement."[11] According to the court, given the express disclosure obligation, the implied covenant of good faith and fair dealing "has no work to do" because "the express waiver of fiduciary duties and the clearly defined disclosure requirement … prevent the implied covenant from adding any additional disclosure obligations to the agreement."[12] Once the Unaffiliated Unitholder Vote safe harbor applied, the court dismissed the case because "the Merger is deemed approved by all the limited partners, including plaintiff, and is immune to challenge for contractual breach."[13]

---

[11] *Dieckman v. Regency GP LP*, 2016 WL 1223348, at *9 (Del. Ch. Mar. 29, 2016).
[12] *Id*.
[13] *Id*. at *10.

13

## II.

The appeal comes to us from the Court of Chancery's decision granting the defendants' motion to dismiss. Our review is *de novo*.[14]

## A.

We start with the settled principles of law governing Delaware limited partnerships. The Delaware Revised Uniform Limited Partnership Act ("DRUPLA") gives "maximum effect to the principle of freedom of contract."[15] One freedom often exercised in the MLP context is eliminating any fiduciary duties a partner owes to others in the partnership structure.[16] The act allows drafters of Delaware limited partnerships to modify or eliminate fiduciary-based principles of governance, and displace them with contractual terms.

With the contractual freedom accorded partnership agreement drafters, and the typical lack of competitive negotiations over agreement terms, come corresponding responsibilities on the part of investors to read carefully and understand their investment. Investors must appreciate that "with the benefits of investing in alternative entites often comes the limitation of looking to the contract as the exclusive source of protective rights."[17] In other words, investors can no

---

[14] *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 (Del. 2013).
[15] 6 *Del. C.* § 17-1101(c).
[16] 6 *Del. C.* § 17-1101(d).
[17] *The Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 135 A.3d 76, 2016 WL 912184, at *2 (Del. Mar. 10, 2016).

longer hold the general partner to fiduciary standards of conduct, but instead must rely on the express language of the partnership agreement to sort out the rights and obligations among the general partner, the partnership, and the limited partner investors.

Even though the express terms of the agreement govern the relationship when fiduciary duties are waived, investors are not without some protections. For instance, in the case of an ambiguous partnership agreement of a publicly traded limited partnership, ambiguities are resolved as with publicly traded corporations, to give effect to the reading that best fulfills the reasonable expectations an investor would have had from the face of the agreement.[18] The reason for this is simple. When investors buy equity in a public entity, they necessarily rely on the text of the public documents and public disclosures about that entity, and not on parol evidence.[19] And, of course, another protection exists. The DRUPLA

---

[18] *Bank of New York Mellon v. Commerzbank Capital Funding Trust II*, 65 A.3d 539, 551-52 (Del. 2013) (construing an agreement against the drafter to give effect to the "investors' reasonable expectation" using a species of the *contra proferentem* doctrine); *see also Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 365 n. 56 (Del. 2013); *SI Mgmt., L.P. v. Wininger*, 707 A.2d 37, 42-43 (Del. 1998).

[19] *Stockman v. Heartland Industrial Partners, L.P.*, 2009 WL 2096213 at *5 (Del. Ch. July 14, 2009) (ambiguities are construed against drafter "to protect the reasonable expectations of people who join a partnership or other entity after it was formed and must rely on the face of the operating agreement to understand their rights and obligations when making the decision to join.").

provides for the implied covenant of good faith and fair dealing, which cannot be eliminated by contract.[20]

The implied covenant is inherent in all contracts and is used to infer contract terms "to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[21] It applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[22] The reasonable expectations of the contracting parties are assessed at the time of contracting.[23] In a situation like this, involving a publicly traded MLP, the pleading-stage inquiry focuses on whether, based on a reading of the terms of the partnership agreement and consideration of the relationship it creates between the MLP's investors and managers, the express terms of the agreement can be reasonably read to imply certain other conditions, or leave a gap, that would prescribe certain conduct, because it is necessary to vindicate the apparent intentions and reasonable expectations of the parties.

**B.**

The Court of Chancery decided that the implied covenant could not be used to remedy what the plaintiff alleged were faulty safe harbor approvals because the

---

[20] *See 6 Del. C.* § 17-1101(d).
[21] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal citations omitted).
[22] *Id.* at 1126 (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).
[23] *Id.* (citing *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del. Ch. 2000)).

16

LP Agreement waived fiduciary-based standards of conduct and contained an express contractual term addressing what disclosures were required in merger transactions. According to the court, the implied covenant had "no work to do" because the express disclosure requirement displaced the implied covenant.[24]

The Court of Chancery erred by focusing too narrowly on whether the express disclosure provision displaced the implied covenant. Instead, it should have focused on the language of the safe harbor approval process, and what its terms reasonably mean. Although the terms of the LP Agreement did not compel the General Partner to issue a proxy statement, it chose to undertake the transaction, which the LP Agreement drafters would have known required a pre-unitholder vote proxy statement. Thus, the General Partner voluntarily issued a proxy statement to induce unaffiliated unitholders to vote in favor of the merger transaction. The favorable vote led not only to approval of the transaction, but allowed the General Partner to claim the protections of the safe harbor and immunize the merger transaction from judicial review. Not surprisingly, the express terms of the LP Agreement did not address, one way or another, whether the General Partner could use false or misleading statements to enable it to reach the safe harbors.

---

[24] *Dieckman*, 2016 WL 1223348, at *9.

17

We find that implied in the language of the LP Agreement's conflict resolution provision is a requirement that the General Partner not act to undermine the protections afforded unitholders in the safe harbor process. Partnership agreement drafters, whether drafting on their own, or sitting across the table in a competitive negotiation, do not include obvious and provocative conditions in an agreement like "the General Partner will not mislead unitholders when seeking Unaffiliated Unitholder Approval" or "the General Partner will not subvert the Special Approval process by appointing conflicted members to the Conflicts Committee." But the terms are easily implied because "the parties must have intended them and have only failed to express them because they are too obvious to need expression."[25] Stated another way, "some aspects of the deal are so obvious to the participants that they never think, or see no need, to address them."[26]

---

[25] *Danby v. Osteopathic Hospital Ass'n of Del.*, 101 A.2d 308, 313-14 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954).

[26] *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014 WL 2768782, at *16 (Del. Ch. June 12, 2014), *rev'd on other grounds sub nom. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, __A.3d __, 2016 WL 7380418 (Del. Dec. 20, 2016) (citing *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)); 508 A.2d at 880 ("[P]arties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations.") (quoting *Corbin on Contracts* (Kaufman Supp. 1984), § 570)); *see also Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997), *aff'd*, 708 A.2d 989 (Del. 1998) ("Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are too obvious to need expression." (quoting *Danby*, 101 A.2d at 313-14)).

Our use of the implied covenant is based on the words of the contract and not the disclaimed fiduciary duties. Under the LP Agreement, the General Partner did not have the full range of disclosure obligations that a corporate fiduciary would have had. Yet once it went beyond the minimal disclosure requirements of the LP Agreement, and issued a 165-page proxy statement to induce the unaffiliated unitholders not only to approve the merger transaction, but also to secure the Unaffiliated Unitholder Approval safe harbor, implied in the language of the LP Agreement's conflict resolution provision was an obligation not to mislead unitholders.

Further, the General Partner was required to form a Conflicts Committee comprised of members who:

> [A]re not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common units are listed or admitted to trading.[27]

As with the contract language regarding Unaffiliated Unitholder Approval, this language is reasonably read by unitholders to imply a condition that a Committee has been established whose members genuinely qualified as

---

[27] App. to Opening Br. at 62 (LP Agreement § 1.1).

19

unaffiliated with the General Partner and independent at all relevant times. Implicit in the express terms is that the Special Committee membership be genuinely comprised of qualified members and that deceptive conduct not be used to create the false appearance of an unaffiliated, independent Special Committee.

## C.

The plaintiff has agreed that the LP Agreement's safe harbor provisions, if satisfied, would preclude judicial review of the transaction. But we find that the plaintiff has pled sufficient facts to support his claims that those safe harbors were unavailable to the General Partner. Instead of staffing the Conflicts Committee with independent members, the plaintiff alleges that the chair of the two-person Committee started reviewing the transaction while *still* a member of an Affiliate board. Just a few days before the General Partner created the Conflicts Committee, the same director resigned from the Affiliate board and became a member of the General Partner's board, and then a Conflicts Committee member.

Further, after conducting the negotiations with ETE over the merger terms and recommending the merger transaction to the General Partner, the two members of the Conflicts Committee joined an Affiliate's board the day the transaction closed. The plaintiff also alleges that the Conflicts Committee members failed to satisfy the audit committee independence rules of the New York Stock Exchange, as required by the LP Agreement. In the proxy statement used to solicit

20

Unaffiliated Unitholder Approval of the merger transaction, the plaintiff alleges that the General Partner materially misled the unitholders about the independence of the Conflicts Committee members. In deciding to approve the merger, a reasonable unitholder would have assumed based on the disclosures that the transaction was negotiated and approved by a Conflicts Committee composed of persons who were not "affiliates" of the general partner and who had the independent status dictated by the LP Agreement. This assurance was one a reasonable investor may have considered a material fact weighing in favor of the transaction's fairness.

The plaintiff has therefore pled facts raising sufficient doubt about the General Partner's ability to use the safe harbors to shield the merger transaction from judicial review. Thus, we reverse the judgment of the Court of Chancery dismissing Counts I and II of the complaint.