# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ADRIAN DIECKMAN, on behalf of )
himself and all others similarly situated, )
)
Plaintiff, )
)
v. )    C.A. No. 11130-CB
)
REGENCY GP LP, REGENCY GP )
LLC, ENERGY TRANSFER EQUITY, )
L.P., ENERGY TRANSFER )
PARTNERS, L.P., ENERGY )
TRANSFER PARTNERS, GP, L.P., )
MICHAEL J. BRADLEY, JAMES W. )
BRYANT, RODNEY L. GRAY, JOHN )
W. McREYNOLDS, MATTHEW S. )
RAMSEY and RICHARD BRANNON, )
)
)
Defendants. )

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

WHEREAS:

A.    Before April 2015, Regency Energy Partners LP ("Regency" or the "Partnership") was a publicly listed master limited partnership ("MLP") that gathered, processed, treated, and transported natural gas.[1]

---

[1] The facts recited herein are taken from the Verified Amended Class Action Complaint filed on May 5, 2017 (Dkt. 65).

B.     Regency was managed by its general partner, defendant Regency GP, LP (the "General Partner"), which in turn was managed by the board of directors (the "Regency Board") of its general partner, defendant Regency GP LLC. The Regency Board consisted of the six individual defendants: Michael J. Bradley, Richard Brannon, James W. Bryant, Rodney L. Gray, John W. McReynolds, and Matthew S. Ramsey.

C.     Regency, the General Partner, and Regency GP LLC were indirectly owned by defendant Energy Transfer Equity, L.P. ("ETE"), a MLP that sat atop of the "Energy Transfer family."[2] The Energy Transfer family also included Energy Transfer Partners, L.P. ("ETP"), Sunoco LP, and Sunoco Logistics Partners, L.P.

D.     The rights and the duties of the General Partner, Regency GP LLC, and the unitholders were governed by Regency's Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement" or "LPA"). The default standard of conduct in the LPA is that the General Partner must act in "good faith" when taking action as the General Partner.[3] "In order for a determination or other action to be in 'good faith' for purposes of [the LPA], the Person or Persons making such

---

[2] A chart depicting the relationship among the entities making up the Energy Transfer family is included in the court's prior decision in this action. *See Dieckman v. Regency GP LP*, 2016 WL 1223348, at *2 (Del. Ch. Mar. 29, 2016), *rev'd*, 155 A.3d 358 ("*Regency I*").

[3] Transmittal Aff. of James M. Yoch, Jr. (Yoch Aff.) Ex. 1 (LPA) § 7.09(b).

2

determination or taking or declining to take such other action must believe that the determination or other action is in the best interests of the Partnership."[4]

E.     On January 16, 2015, the boards of ETE and ETP held a joint meeting to discuss a potential merger of ETP and Regency. Later that day, the ETP board made a proposal to merge Regency into ETP for a combination of cash and stock reflecting an exchange ratio of 0.4044 ETP common units per one common unit of Regency and a $137 million cash payment.

F.     Also on January 16, 2015, Brannon was appointed to the Regency Board while he was still a director of an affiliated entity (Sunoco LP) within the Energy Transfer family, and the Regency Board determined that it would delegate authority to the Conflicts Committee to review and analyze the proposed transaction.

G.     The Conflicts Committee came to have two members: Bryant and Brannon. Brannon was appointed to the Conflicts Committee on January 20, 2015, the same day he resigned from Sunoco LP's board. Before Brannon even was appointed to the Conflicts Committee, he and Bryant "met with Akin Gump (selected by Regency) to discuss general issues and strategy with regard to the proposed transaction and the draft merger agreement."[5] Brannon and Bryant retained as the Conflict Committee's financial advisor JP Morgan, which had been

---

[4] *Id.*

[5] Am. Compl. ¶ 5.

3

selected by Regency's CFO, Thomas Long, and which had a highly lucrative relationship with ETP and its affiliates in recent years.

H.     On January 25, 2015, the Conflicts Committee accepted ETP's merger proposal, offering an exchange ratio of 0.4066 and a cash payment of $0.32 per common unit of Regency (the "Merger"), and it recommended that the Regency Board approve the proposal as well. The Regency Board accepted ETP's offer that day, although the terms of the Merger subsequently were amended to provide additional ETP stock in lieu of the cash component. The Conflicts Committee did not solicit any other potential buyers or conduct a market check.

I.     On April 28, 2015, a majority of Regency's unitholders voted to approve the Merger, which closed on April 30. That same day, Brannon rejoined, and Bryant joined, Sunoco LP's board.

J.     On June 10, 2015, plaintiff filed this action.

K.     On March 29, 2016, the court issued a memorandum opinion and dismissed plaintiff's complaint on the ground that defendants had availed themselves of the unitholder approval safe harbor in the LPA.[6] That conclusion caused plaintiff's other claims to fail as well.[7]

---

[6] *Regency I*, 2016 WL 1223348, at *10.
[7] *Id.* at *11-13.

4

L.     On January 20, 2017, the Delaware Supreme Court reversed that decision, concluding that plaintiff had "pled sufficient facts . . . that neither safe harbor was available to the general partner because it allegedly made false and misleading statements to secure Unaffiliated Unitholder Approval, and allegedly used a conflicted Conflicts Committee to obtain Special Approval."[8]

M.     On May 5, 2017, plaintiff filed the Verified Amended Class Action Complaint (the "Amended Complaint") asserting four claims. Count I asserts that the General Partner and Regency GP LLC breached the LPA by approving the Merger when they did not believe that it was in the best interests of the Partnership. Count II asserts that the General Partner and Regency GP LLC breached the implied covenant of good faith and fair dealing by approving the Merger. Count III asserts that all defendants, other than the General Partner and Regency GP LLC, aided and abetted a breach of the LPA. Count IV asserts that all defendants, other than the General Partner and Regency GP LLC, tortiously interfered with the LPA.

N.     On May 19, 2017, defendants moved to dismiss the Amended Complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

---

[8] *Dieckman v. Regency GP LP*, 155 A.3d 358, 361-62 (Del. 2017) ("*Regency II*").

NOW THEREFORE, the court having considered the parties' submissions, IT IS HEREBY ORDERED, this 20th day of February, 2018, as follows:

1.     The standards governing a motion to dismiss for failure to state a claim for relief are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[9]

2.     Count I. Defendants' motion to dismiss Count I is **DENIED** because the Amended Complaint alleges facts from which it is reasonably conceivable that the General Partner and Regency GP LLC did not believe that the Merger was in the best interests of the Partnership and thus violated LPA § 7.9(b).

3.     Delaware courts have held that contractual language similar to Section 7.9(b) requires directors to have subjectively believed that a transaction was in the best interests of the partnership.[10] But "state of mind and knowledge may be averred

---

[9] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[10] *See, e.g., Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 104 (Del. 2013) (holding that the use of the unmodified verb "believes" in a limited partnership agreement imposes a subjective standard).

6

generally pursuant to Rule 9(b) because 'any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable.'"[11]

4.     As our Supreme Court has recognized, "it may be virtually impossible for a . . . plaintiff to sufficiently and adequately describe the defendant's state of mind at the pleadings stage."[12]  Accordingly, "objective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting" he believed a transaction was in the best interests of the partnership.[13]  When a court undertakes such an analysis, "[t]he directors' personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction."[14]

---

[11] *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citation omitted); *see also Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) ("[A] fairly pleaded claim of good faith/bad faith raises essentially a question of fact which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery.") (citation omitted).

[12] *Desert Equities*, 624 A.2d at 1208; *see also Encore Energy*, 72 A.3d at 106 (noting that even after trial, "[d]espite their expertise, the members of the Court of Chancery cannot peer into the 'hearts and souls of directors' to determine their subjective intent with certainty.") (citation omitted).

[13] *Encore Energy*, 72 A.3d at 107.

[14] *Id.*

7

5.     Here, plaintiff has pleaded sufficient facts from which, when viewed collectively,[15] it is reasonably conceivable that the General Partner and Regency GP LLC did not subjectively believe that the Merger was in the best interests of the Partnership. Such factual allegations include the following:

- Regency had a bright future as a standalone entity and there was no need to complete the Merger in order to lower its cost of capital, which was the only purported benefit to Regency listed in the proxy statement.[16]

- Even though Regency objectively would have been better off as a standalone entity, its stable revenue stream and growth were deployed to shore up a struggling ETP, in a transaction that was accretive to ETP.[17]

- The substantive Merger negotiations spanned less than one week and were conducted in a "halfhearted and perfunctory" manner.[18]

- The Conflicts Committee was composed in a "musical chairs" fashion, where directors fluidly rotated around the boards of entities in the Energy Transfer family, casting doubt on the Committee's independence.[19]

---

[15] See Gelfman v. Weeden Inv'rs, L.P., 792 A.2d 977, 990 (Del. Ch. 2001) (listing objective factors, when taken together, that support an inference of bad faith).

[16] Am. Compl. ¶¶ 2-3, 122-27.

[17] Am. Compl. ¶¶ 45, 113.

[18] Am. Compl. ¶ 134.

[19] Am. Compl. ¶¶ 69, 71-73.

8

- The Conflicts Committee used a financial advisor (JP Morgan) pre-selected by Regency's CFO that had provided a wide range of services to ETP and its affiliates in recent years.[20]

- Members of the Regency Board were highly experienced in the industry yet still approved a deal that benefited ETP but did not benefit the Partnership.[21]

- The proxy statement seeking unitholder approval for the Merger was false and misleading because it led unitholders to believe that Brannon and Bryant were independent from ETE and ETP.[22] As the Supreme Court explained:

  > The proxy statement did not inform unitholders about the circumstances of [Brannon's] alleged overlapping and shifting allegiances, including reviewing the proposed transaction while still a member of the Sunoco board, his nearly contemporaneous resignation from the Sunoco board and appointment to the General Partner's board and then the Conflicts Committee, or [Bryant's] appointment and [Brannon's] reappointment to the Sunoco board the day the transaction closed.[23]

6.     Count II. Defendants' motion to dismiss Count II is **GRANTED** because it impermissibly repackages Count I, plaintiff's breach of contract claim. "The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a

---

[20] Am. Compl. ¶¶ 88-89.

[21] Am. Compl. ¶¶ 21-26; 121-28.

[22] Am. Compl. ¶¶ 77-82.

[23] *Regency II*, 155 A.3d at 365.

9

specific agreement."[24] If "the language of the contract expressly covers a particular issue," then "the implied covenant will not apply."[25]

7.     Plaintiff argues that "the LPA does not address whether [the General Partner] could ever be said to act in good faith if it agrees to a merger designed and timed solely for the benefit of ETP and ETE and that is highly unfair to the limited partners."[26] Section 7.9(b) of the LPA, however, is sufficiently broad to cover such a scenario. It provides that, for the General Partner and Regency GP LLC to have acted in good faith, they had to have believed the transaction was "in the best interests of the Partnership." A transaction that is in the best interests of the Partnership logically should not be "highly unfair to the limited partners."[27] Thus, the LPA "sets a contractual standard by which to evaluate" the actions of the General Partner and Regency GP LLC so that "[t]here is no gap in the [LPA] to fill in this regard."[28]

---

[24] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182 (Del. Ch. 2014).

[25] *Id.* at 183.

[26] Pl.'s Answering Br. 43.

[27] *See El Paso Pipeline*, 113 A.3d at 181 ("When considering [the best interests of the partnership], the Conflicts Committee has discretion to consider the full range of entity constituencies, including but not limited to employees, creditors, suppliers, customers, the general partner, . . . ***and of course the limited partners.***") (emphasis added).

[28] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *5 (Del. Ch. Jan. 30, 2015).

8.    Count III. Defendants' motion to dismiss Count III is **GRANTED** because there can be no liability for aiding and abetting a breach of a contractual duty created by the LPA under Delaware law. "Delaware law does not recognize a claim for aiding and abetting a breach of contract."[29] An exception to this rule arises where a contract creates fiduciary duties, but that exception does not apply here.[30]

9.    The LPA did not create fiduciary duties contractually.[31]    The Partnership Agreement eliminated all fiduciary duties[32] and replaced them with a contractual obligation requiring the General Partner to subjectively believe that its actions were in the best interests of the Partnership.[33]    Thus, because the LPA

---

[29] *Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013) (citing *Zimmerman v. Crothall*, 2012 WL 707238, at *19 (Del. Ch. Mar. 12, 2012)).

[30] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172-73 (Del. 2002).

[31] *See Gotham Partners*, 817 A.2d at 173 ("[T]he General Partner had a fiduciary relationship with the Partnership and its limited partners as defined by the Partnership Agreement . . . which impose[d] the fiduciary duties of entire fairness."); *El Paso Pipeline*, 113 A.3d at 193 ("Because the alternative entity statutes permit the entity's governing agreement to modify, alter, or expand fiduciary duties, there are situations involving alternative entities where a party could owe fiduciary duties, the scope of the fiduciary duty would be established by contract, and a third party could aid and abet a breach of the contractually measured fiduciary duty.").

[32] *See* Yoch Aff. Ex. 1 § 7.9(e) ("Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.").

[33] Yoch Aff. Ex. 1 § 7.9(b).

11

established a "purely contractual relationship, a theory of aiding and abetting a breach of contract is unavailable in this case."[34]

10.    Count IV. Defendants' motion to dismiss Count IV is **GRANTED**. "In order to state a claim for tortious interference with contractual rights, a plaintiff must allege the existence of '(1) a contract; (2) about which Defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.'"[35]

11.    Directors tortuously interfere with their company's agreements "if and only if [they] exceed the scope of [their] agency in so doing."[36] Simply alleging that an officer or director caused his company to breach its contract, as plaintiff does here,[37] without more, is insufficient for a tortious interference claim.[38] This analysis does not change merely because a pass-through entity (*i.e.*, the General Partner) sits

---

[34] *El Paso Pipeline*, 113 A.3d at 194.

[35] *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002) (citation omitted).

[36] *Id.* (alterations in original and citations omitted).

[37] *See* Am. Compl. ¶ 185.

[38] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *12 (Del. Ch. May 5, 2010); *see Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Merely stating that the Officers controlled the General Partner fails to support a claim of tortious interference."); *see also Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007) ("After all, '[a] defendant cannot interfere with its own contract.'") (alteration in original and citation omitted).

12

between the members of the Regency Board and the company they control (*i.e.*, Regency).[39]

12. Plaintiff argues that "[t]ortious interference claims are also properly asserted against ETE, ETP, and [Energy Transfer Partners, GP, L.P.], which are the ultimate parents and affiliates, respectively, of [the General Partner]."[40] This assertion of the possibility of liability may be correct under Delaware law,[41] but whether an entity can be sued is distinct from actually stating a claim against that entity. The Amended Complaint fails to allege facts from which it reasonably can be inferred that ETE, ETP, or Energy Transfer Partners, GP, L.P. had the requisite

---

[39] *See, e.g., Norton v. K-Sea Transp. Partners, L.P.,* 67 A.3d 354, 367-68 (Del. 2013) (en banc) (holding that a "pass-through" entity was entitled to a good-faith presumption under a limited partnership agreement when the board of its parent entity met the requirements for that presumption); *Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 884 (Del. Ch. 2009) (controllers of entities that in turn controlled defendant could not be liable for tortious interference with defendant's contract as long as the controllers were acting within the scope of their authority); *Tenneco,* 2007 WL 92621, at *5 ("Imposition of liability for tortious interference with contractual relationship requires that the defendant be a stranger to both the contract and the business relationship giving rise to and underpinning the contract.") (citation and internal quotation marks omitted).

[40] Pl.'s Answering Br. 52-53.

[41] *See NAMA Holdings, LLC v. Related WMC LLC,* 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) ("Delaware's respect for corporate separateness also means that Delaware maintains a role for tortious interference with contract even in the parent-subsidiary context.").

13

mental state or committed any "intentional act" necessary to state a tortious interference claim.

_____

Chancellor