**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3069
_____

MICHAEL COHN, Individually and on behalf of All Others Similarly Situated,
Appellant

v.

SUNCOKE ENERGY PARTNERS, L.P.; SUNCOKE ENERGY, INC.;
MICHAEL G. RIPPEY; ALVIN BLEDSOE; P. MICHAEL HARDESTY; JOHN W.
SOMERHALDER, II; FAY WEST; KATHERINE T. GATES; MARTHA CARNES;
JOHN W. ROWE; PETER B. HAMILTON; JAMES E. SWEETNAM; SUSAN R.
LANDAHL; ROBERT A. PEISER; SUNCOKE ENERGY PARTNERS GP LLC
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:19-cv-00693)
District Judge:  Honorable Colm F. Connolly
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 24, 2021

Before:  GREENAWAY, JR., SHWARTZ, *Circuit Judges*,
and KANE,* *District Judge*
(Filed: August 31, 2021)
_____

OPINION**
_____

---

*        Honorable Yvette Kane, District Judge, United States District Court for the
Middle District of Pennsylvania, sitting by designation.
**       This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does
not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge.*

Securities transactions are highly regulated. Mergers require particular attention so as to maintain public confidence. Allegations of impropriety must be assessed and addressed. This securities class action lawsuit arises out of a stock-for-unit merger transaction wherein SunCoke Energy, Inc. acquired all outstanding units of the target entity, SunCoke Energy Partners, L.P. Public unitholders of the target entity challenged the transaction, asserting that the organizational mechanism designed to protect against conflicts of interest was fatally ineffective in this instance, rendering the merger illegitimate. The District Court granted the Defendants' motion to dismiss. We will affirm.

## I.     Background

Michael Cohn was a unitholder of SunCoke Energy Partners, L.P. ("SXCP"). In 2019, SXCP was acquired by SunCoke Energy, Inc. ("SunCoke" or "SXC"). Prior to the merger, SXCP traded independently of SunCoke on the New York Stock Exchange. The merger involved SXCP's sole General Partner, SunCoke Energy Partners, G.P. LLC ("SXCP GP"), which was 100% owned by SunCoke through SunCoke's wholly owned subsidiary Sun Coal & Coke LLC ("SC&C"). SC&C was SXCP's Organizational Limited Partner. SC&C was also the record-holder and beneficial owner of 61.7% of SXCP's outstanding common units, which it had the right to vote.

SXCP was governed by a Limited Partnership Agreement (the "LPA"), to which SXCP, SXCP GP, and SC&C were all signatories. The LPA included the following provision at Section 7.9(c):

> Whenever a potential conflict of interest exists or arises between the General Partner or any Affiliates, on the one hand, and the Partnership, any Group Member or any Partner, any other Person who acquires an interest in a Partnership Interest or any other Person who is bound by this Agreement on the other hand, the General Partner may in its discretion submit any resolution or course of action with respect to such conflict of interest for (i) Special Approval or (ii) approval by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates). If such course of action or resolution receives Special Approval or approval of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), then such course of action or resolution shall be conclusively deemed approved by the Partnership, all the Partners, each Person who acquires an interest in a Partnership Interest and each other Person who is bound by this Agreement, and shall not constitute a breach of this Agreement, of any Group Member Agreement, of any agreement contemplated herein or therein, or of any fiduciary or other duty existing at law, in equity or otherwise or obligation of any type whatsoever.

J.A. 296–97.[1]

The LPA defines "Special Approval" as "approval by a majority of the members of the Conflicts Committee," J.A. 250, which is in turn defined as a committee of the Board of Directors comprising at least two independent directors, none of whom is an officer or employee of SXCP GP or its affiliates or holds any ownership interest therein.

Pursuant to a merger agreement announced February 5, 2019, SunCoke acquired all outstanding common units of SXCP not already owned by SunCoke in a stock-for-unit transaction. The merger was approved by SXCP's Board of Directors and a majority of

---

[1] The parties refer to this language as the LPA's "safe harbor provision."

the members of the Conflicts Committee, as well as holders of a majority of the outstanding SunCoke common shares and SXCP common units. Through SC&C, SunCoke alone indirectly owned a sufficient percentage of the SXCP common units to approve the transaction on behalf of SXCP common unitholders.

Several SXCP unitholders challenged the merger, and those suits were consolidated in this action. The operative Consolidated Class Action Complaint (the "Complaint") alleges violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and rules promulgated thereunder, as well as violations of Delaware state law.

The District Court granted the Defendants' motion to dismiss, finding that the Exchange Act claims necessarily failed because the Plaintiff did not plead transaction causation, and the state law claims necessarily failed because the Defendants' compliance with Section 7.9(c)'s safe harbor provision insulated them from suit. *In re SunCoke Energy Partners, L.P.*, No. 19-CV-693-CFC, 2020 WL 5411286, at \*3–4 (D. Del. Sept. 9, 2020).

Cohn timely appealed. **D.C. Dkt. No. 63.** Our review of the District Court's decision granting the motion to dismiss is plenary. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009).

**II.    Discussion**[2]

   A.  Exchange Act Claims

      1.  *Section 14(a)*

Counts I and II of the Complaint allege violations of § 14(a) of the Exchange Act,

15 U.S.C. § 78n(a), and two rules and regulations promulgated thereunder:  17 C.F.R.

§ 244.100 and Rule 14a-9, respectively.  Section 14(a) provides that it shall be unlawful

"to solicit any proxy or consent or authorization in respect of any security" in

contravention of the rules and regulations promulgated by the Securities and Exchange

Commission.  15 U.S.C. § 78n(a).

To prevail on a § 14(a) claim, a plaintiff must show "a causal relationship between

the violation and the injury for which he seeks redress," which requires proof that "the

proxy solicitation itself, rather than the particular defect in the solicitation materials, was

an essential link in the accomplishment of the transaction."  *Mills v. Elec. Auto-Lite Co.*,

396 U.S. 375, 385 (1970).  In other words, the solicitation must form the causal link

between "a directors' proposal [and] the votes legally required to authorize the action

proposed."  *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991).  The

Complaint here fails to establish the requisite nexus.

In *Scattergood v. Perelman*, this Court relied on *Virginia Bankshares* in holding

that transaction causation could not be proven where the defendant "had the legal power

to effectuate [the challenged] freeze-out merger," despite plaintiffs' argument that the

---

[2]     The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 and 15 U.S.C. § 78aa.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

defendant "would not have been willing to exercise that power" but for "its misleading proxy statement." 945 F.2d 618, 626 (3d Cir. 1991).

Appellant argues that the transaction causation requirement is satisfied here—even though SunCoke controlled a majority of the outstanding units—because the Conflicts Committee's approval was required to authorize the merger, and the Conflicts Committee acted on behalf of the minority unitholders.

However, the plain text of the LPA reveals that the Conflicts Committee's approval was *not* required to authorize the merger. In fact, consummation of the merger was governed by a separate portion of the LPA. Article XIV is titled "Merger or Consolidation"; Section 14.2 governs the "procedure for merger or consolidation," and provides that a merger requires the prior consent of SXCP GP. J.A. 319 (capitalization omitted). Section 14.3(b), which governs "approval by limited partners," reads:

> Except as provided in Sections 14.3(d) and 14.3(e), *the Merger Agreement shall be approved upon receiving the affirmative vote or consent of the holders of a Unit Majority* unless the Merger Agreement contains any provision that, if contained in an amendment to this Agreement, the provisions of this Agreement or the Delaware Act would require for its approval the vote or consent of a greater percentage of the Outstanding Units or of any class of Limited Partners, in which case such greater percentage vote or consent shall be required for approval of the Merger Agreement.

J.A. 321 (emphasis added; capitalization omitted).

The Amended Form S-4 Registration Statement, which forms the basis of Appellant's Exchange Act claims, in fact undermines those claims. It explained that consummation of the merger by SXCP "requires the affirmative vote or consent of holders of at least a majority of the outstanding SXCP Common Units"; that SC&C's

6

delivery of written consent to the merger would "**be sufficient to approve the Merger Agreement and the transactions contemplated thereby, including the Merger, on behalf of SXCP**"; and that SC&C had pledged to deliver its written consent in a Support Agreement executed concurrently with the Merger Agreement. J.A. 18 (emphasis in original); *see also* J.A. 33, 57, 62 (reiterating that SC&C's written consent would be sufficient to approve the merger on behalf of SXCP).[3]

As the District Court correctly found, Section 7.9(c) is merely an elective safe harbor provision[4] that, when utilized, provides a shield against liability for breach of contract, fiduciary duty, or other duty or obligation. Its own terms make clear that it is not a prerequisite to the consummation of a merger, and this conclusion is bolstered by the absence of any reference to the Special Approval process in Article XIV.

It may be that Appellees would have opted not to finalize the merger absent Special Approval in light of the potential exposure to legal liability. However, this hypothetical has no more traction here than its analog did in *Scattergood*, where we applied "*Virginia Bankshares*' bar on nonvoting causation theories" to find that the defendant's "legal power to effectuate a freeze-out merger" precluded a showing of transaction causation. 945 F.2d at 625–26. The critical fact is that SunCoke, through SC&C, controlled a majority of the outstanding common units, and therefore had "the

---

[3]    The Complaint acknowledges that the Support Agreement "purport[ed] to make the Merger a *fait accompli*." J.A. 349.

[4]    Section 7.9(c) provides that where a potential conflict of interest arises, "the General Partner *may in its discretion* submit any resolution or course of action with respect to such conflict of interest for . . . special approval." J.A. 297 (emphasis added).

votes legally required to authorize the action proposed." *Virginia Bankshares*, 501 U.S. at 1102.

The District Court correctly held that Appellant failed to plead transaction causation here because the minority unitholders' "votes were not needed to authorize the merger." *In re SunCoke Energy Partners, L.P.*, 2020 WL 5411286, at *2.

    2. *Section 20(a)*

Count III of the Complaint alleges violations of § 20(a) of the Exchange Act, which provides for liability of controlling persons who aid and abet violations of the Exchange Act. 15 U.S.C. § 78t(a). A violation of the Exchange Act is a predicate for derivative liability under § 20(a), so Appellant's failure to plead any such violation is fatal to this claim. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014); *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

B. <u>State Law Claims</u>

Counts IV and V of the Complaint allege that the SXCP GP's Board members breached their duty of good faith and fair dealing and their fiduciary duty. Counts VI and VII allege that SXCP GP and its Board members are liable for breach of contract. Finally, Count VIII of the Complaint alleges that SunCoke and its Board members are liable for aiding and abetting breach of contract.

The District Court found that these claims were barred because the Special Approval process entitled the Defendants "to the protection of the partnership

8

agreement's safe harbor provision." *In re SunCoke Energy Partners, L.P.*, 2020 WL 5411286, at *4. We agree.

Appellant argues that Section 7.9(c) does not shield Appellees from suit because the Conflicts Committee failed to comply with its requirements, rendering the Special Approval process defective. He reasons that the Conflicts Committee's alleged failure to "act in the best interests of its principals ([i.e.,] the minority unitholders)" makes the grant of Special Approval inadequate to satisfy Section 7.9(c)'s requirements. Appellant Br. 22. This argument is based on the allegations that "the Conflicts Committee (1) constrained itself by only using prospective financial information prepared by a conflicted counterparty, (2) relied on a fairness opinion by a conflicted banker[,] and (3) foreclosed itself from the ability to evaluate new information." *Id.*

Appellant submits that these allegations establish that the Conflicts Committee breached its duty of good faith pursuant to Section 7.9(a) of the LPA, which governs the Conflicts Committee's conduct. That Section provides in relevant part:

> Whenever the General Partner, the Board of Directors, or any committee of the Board of Directors (including the Conflicts Committee), makes a determination or takes or declines to take any other action, or any Affiliates of the General Partner cause the General Partner to do so, in its capacity as the general partner of the Partnership as opposed to in its individual capacity, whether under this Agreement, any Group Member Agreement, or any other agreement contemplated hereby or otherwise, then, unless another express standard is provided for in this Agreement, the General Partner, the Board of Directors, such committee or such Affiliates causing the General Partner to do so, shall make such determination or take or decline to take such other action in good faith and shall not be subject to any higher standard contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity. A determination, other action or failure to act by the General Partner, the Board of Directors of the General Partner or any committee thereof (including the Conflicts Committee) *will be deemed to be*

9

*in good faith unless the General Partner*, the Board of Directors of the General Partner or any committee thereof including the Conflicts Committee) *believed such determination, other action or failure to act was adverse to the interests of the partnership*.

J.A. 296 (emphasis added). In a proceeding such as this one, the plaintiff bears "the burden of proving that such determination, action or failure to act was not in good faith." *Id.*

Appellant does not contest that the LPA validly disclaims default fiduciary duties pursuant to Delaware law. *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 252 (Del. 2017), *as revised* (Mar. 28, 2017) (noting that Delaware law allows parties to disclaim virtually all duties, with notable exception that an LPA drafter may not "disclaim the implied covenant of good faith and fair dealing").

The power to disclaim contains the freedom to modify. As Delaware's Court of Chancery has recognized, "the use of the unmodified verb 'believe' in the definition of 'good faith' . . . means that the good faith standard in the LP Agreement is subjective and not objective." *Dieckman v. Regency GP LP*, No. 11130-CB, 2021 WL 537325, at *17 (Del. Ch. Feb. 15, 2021) ("*Dieckman II*") (citing *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 101, 104 (Del. 2013)). Here, Section 7.9(a) of the LPA adopts a subjective standard, so Appellees have satisfied their duty of good faith if they subjectively believed their conduct was in the best interests of the partnership. *Id.* at *17 n.222.

The allegations in this case do not establish that Appellees breached this duty. The facts here are distinguishable from *Dieckman v. Regency GP LP*, where the Delaware Supreme Court found that the special approval process did not afford the

10

defendants a safe harbor because the plaintiff pled that the conflicts committee was itself conflicted, and the defendants had used deceptive means to disguise that conflict. 155 A.3d 358, 361–62, 369 (Del. 2017) ("*Dieckman I*"). We agree with the District Court that, in contrast to *Dieckman I*, none of the allegations here "amount[s] to misleading or deceptive conduct or call[s] into question the independence of the Conflicts Committee." *In re SunCoke Energy Partners, L.P.*, 2020 WL 5411286, at \*4; *see also id.* at \*3 ("Reliance on incomplete and flawed information . . . does not constitute bad faith.").

Because the express contractual requirements for Special Approval were satisfied, Appellees will be shielded from suit absent a breach of the implied covenant of good faith and fair dealing. As the Delaware Supreme Court has explained, the implied covenant inheres in every contract and "is used to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated [at the time of contracting].'"[5] *Dieckman I*, 155 A.3d at 367 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)). It is a mechanism "to vindicate the apparent intentions and reasonable expectations of the parties" and to protect the party asserting the covenant from arbitrary or unreasonable conduct on the part of the counterparty. *Id.*

Delaware's Supreme Court has cautioned that the implied covenant "is not an equitable remedy for rebalancing economic interests after events that could have been

---

[5]    In *Dieckman I*, the court reaffirmed that the implied covenant may be employed to give force to terms too "obvious and provocative" for inclusion in a contract, such as: "the General Partner will not mislead unitholders when seeking Unaffiliated Unitholder Approval" and "the General Partner will not subvert the Special Approval process by appointing conflicted members to the Conflicts Committee." 155 A.3d at 368.

11

anticipated, but were not, that later adversely affected one party to a contract." *Nemec*, 991 A.3d at 1128. To the contrary, it is a "limited and extraordinary legal remedy." *Id.* Further, "the implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LCC*, 202 A.3d 482, 507 (Del. 2019) (internal quotation marks and footnote omitted). These restraints on applying the implied covenant have special force where "the parties are sophisticated business persons or entities," as is the case here. *Id.* at 508.

Here, Appellant fails to identify any contractual term that is absent from the LPA, could not have been anticipated when the LPA was negotiated, and is necessary to protect the reasonably expected fruits of the bargain. *See Dieckman I*, 155 A.3d at 367. Consequently, no violation of the implied covenant of good faith and fair dealing has been pleaded, and Appellees are entitled to the full protections of the LPA's safe harbor provision. Appellant's remaining state law claims therefore fail.

## III. Conclusion

For the foregoing reasons, we will affirm.