# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ADRIAN DIECKMAN, on behalf of himself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 11130-CB |
| REGENCY GP LP and REGENCY GP LLC, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 19, 2019
Date Decided: October 29, 2019

Christine M. Mackintosh, GRANT & EISENHOFER P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Edward G. Timlin, and Tamara Gavrilova, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Plaintiff and the Class.*

Rolin P. Bissell, Tammy L. Mercer, and Benjamin M. Potts, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Holmes, Craig E. Zieminski, Kimberly R. McCoy, and Jeffrey Crough, VINSON & ELKINS LLP, Dallas, Texas; *Attorneys for Defendants Regency GP LP and Regency GP LLC.*

**BOUCHARD, C.**

This action involves a master limited partnership in the energy industry that engaged in a conflicted transaction that closed in April 2015. Fact discovery has concluded and the parties have filed cross-motions for summary judgment.

The cross-motions implicate three provisions that commonly appear in MLP agreements. Those provisions concern: (i) approval of a conflicted transaction by an independent committee, known as a "Special Approval;" (ii) approval of a conflicted transaction by a vote of the majority of units not held by the general partner and its affiliates, known as a "Unitholder Approval;" and (iii) action taken by the general partner in reasonable reliance upon the opinion of a professional or expert, such as an investment bank. The standard of review the court must apply to evaluate the transaction at issue in this case would be altered significantly if any of these provisions is triggered.

Plaintiff is a unitholder of Regency Energy Partners LP who brought this action on behalf of a class of Regency common unitholders as of the date of its merger with an affiliate. He seeks partial summary judgment that the Special Approval and Unitholder Approval safe harbors were not satisfied. For the reasons discussed below, the court grants plaintiff's motion because the conflicts committee was not validly constituted, which negates the Special Approval provision; and because the proxy statement for the transaction was materially false and misleading in at least two respects, which negates the Unitholder Approval provision.

1

Defendants consist of the general partner of Regency and the general partner's parent. They seek summary judgment that the general partner's reliance on a fairness opinion from an investment bank triggers a conclusive presumption of good faith that would be dispositive of plaintiff's claim for breach of the partnership agreement. Plaintiff's response is twofold. He contends (i) that the provision governing reliance on an expert does not apply to conflicted transactions and (ii) that a genuine issue of material fact exists concerning whether the general partner actually relied on the investment bank's fairness opinion. For the reasons discussed below, the court agrees with plaintiff on the second point and thus must deny defendants' motion. The court does so without needing to decide the first point.

## I. BACKGROUND

Prior decisions of this court and the Delaware Supreme Court discuss the background of this action extensively.[1] This opinion recites only the facts necessary to decide the parties' cross-motions for summary judgment based on those prior decisions and the parties' submissions.

---

[1] *See Dieckman v. Regency GP LP*, 2016 WL 1223348 (Del. Ch. Mar. 29, 2016); *Dieckman v. Regency GP LP*, 155 A.3d 358 (Del. 2017); *Dieckman v. Regency GP LP*, 2018 WL 1006558 (Del. Ch. Feb. 28, 2018) (ORDER).

## A. The Parties

Regency Energy Partners LP ("Regency") is a Delaware limited partnership that traded publicly until April 30, 2015. Regency is a midstream natural gas company, meaning it engages in gathering, processing, compressing, treating, and transporting natural gas. Plaintiff Adrian Dieckman was a common unitholder of Regency at all relevant times.

Defendant Regency GP LP is a Delaware limited partnership that served as the general partner of Regency. Defendant Regency GP LLC is a Delaware LLC that served as the general partner of Regency GP LP. For simplicity, the court refers to these entities together as the "General Partner."

Energy Transfer Partners L.P. ("ETP") is a Delaware limited partnership that owns the general partner of Sunoco LP ("Sunoco") as well as 43% of the limited partnership interests in Sunoco and 100% of Sunoco's distribution rights. Energy Transfer Partners, GP, L.P. ("EGP") is a Delaware limited partnership that serves as the general partner of ETP. ETP acquired Regency's common units on April 30, 2015 in a merger (the "Merger").

Energy Transfer Equity, L.P. ("ETE") is a Delaware limited partnership that indirectly owns the General Partner of Regency and the general partner of ETP (EGP). ETE thus controlled Regency both before and after ETP acquired Regency in the Merger.

3

The ownership relationships among the relevant entities before the Merger is depicted below, along with the status of Regency after the Merger:



The following six individuals were members of the General Partner's board of directors at all relevant times: Michael Bradley, Richard Brannon, James Bryant, Rodney Gray, John McReynolds, and Matthew Ramsey (collectively, the "Regency board"). Brannon and Bryant constituted the Conflicts Committee of the Regency board when it approved the Merger.

**B.  The Relevant LP Agreement Provisions**

The Limited Partnership Agreement (the "LP Agreement") governs the General Partner's relationship with Regency's limited partners. Section 7.9(b) of

4

the LP Agreement provides that, "[w]henever the General Partner makes a determination or takes or declines to take any other action . . . in its capacity as the general partner of the Partnership . . . , then, unless another express standard is provided for in this Agreement, the General Partner . . . shall make such determination or decline to take such action in good faith."[2]  This means it "must believe that the determination or other action is in the best interests of the Partnership."[3]

Given ETE's control of both Regency (through the General Partner) and ETP (through EGP), it is undisputed that the Merger presented a potential conflict of interest between, on the one hand, the General Partner and, on the other hand, Regency's common unitholders, who had no connection to ETE.  With respect to transactions involving potential conflicts of interest, Section 7.9(a) of the LP Agreement provides, in relevant part, that any course of action taken by the General Partner concerning such conflict of interest "shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity" if any one of four specified safe harbors is satisfied:

> Unless otherwise expressly provided in this Agreement . . . , whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Group Member or any Partner, on the other, any resolution or

[2] Potts Aff. ("Potts Aff. I") Ex. 1 ("LP Agreement") § 7.9(b) (Dkt. 212).

[3] *Id.* § 7.9(b).

course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership taking into account the totality of the relationships between the parties involved . . . .[4]

Of the four safe harbors in Section 7.9(a), only two are relevant to the parties' cross-motions for summary judgment:  the first, *i.e.*, the "Special Approval;" and the second, *i.e.*, the "Unitholder Approval."  These safe harbors are discussed further in Sections III.B-C below.

Another provision of the LP Agreement relevant to the parties' cross-motions is Section 7.10(b).  It provides, in relevant part, that an action of the General Partner taken in reasonable reliance on an investment banker's opinion "shall be conclusively presumed to have been done . . . in good faith."[5]  This provision, and its interplay with Section 7.9(a), is discussed in Section III.A below.

---

[4] *Id.* § 7.9(a) (emphasis added).  The term "General Partner" is defined in the LP Agreement as Regency GP LP, the immediate general partner of Regency.  *Id.* § 1.1 at A-6.

[5] *Id.* § 7.10(b).

## C.    The Merger

On January 16, 2015, the boards of ETE and ETP held a joint meeting to discuss a potential merger of ETP and Regency.[6]  At the meeting, the ETP board approved making a proposal to merge Regency into ETP for 0.4044 ETP common units per common unit of Regency and a $137 million cash payment or $0.36 per common unit of Regency.[7]  Also on January 16, the Regency board delegated authority to the Conflicts Committee to review and consider the proposed transaction.[8]

On January 20, 2015, the Conflicts Committee decided to retain J.P. Morgan Securities, LLC ("J.P. Morgan") as its financial advisor for the Merger, "subject to the negotiation of an acceptable engagement letter, including the related engagement fee."[9]  Regency and the Conflicts Committee entered into an engagement agreement with J.P. Morgan two days later, on January 22, 2015.[10]  The Conflicts Committee also retained Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as its legal advisor for the Merger.[11]

On January 22, 2015, the Conflicts Committee reviewed ETP's proposal to acquire Regency for 0.4044 ETP units and $0.36 per common unit of Regency, and

---

[6] Mackintosh Aff. ("Mackintosh Aff. I") Ex. 7 ("Proxy"), at 51 (Dkt. 214).

[7] *Id.*; Potts Aff. I Ex. 6 (ETP board presentation), at 11.

[8] Proxy at 52; Mackintosh Aff. ("Mackintosh Aff. II") Ex. 44, at 1 (Dkt. 215).

[9] Potts Aff. I Ex. 7, at 5.

7

determined that those terms "were fair to the unaffiliated unitholders of the Partnership."[12] On January 23, ETP increased its offer to 0.4066 ETP units plus $0.31 per common unit of Regency.[13] The next day, on January 24, the parties agreed to modify the offer to 0.4066 ETP units plus $0.32 per common unit of Regency.[14]

On January 25, the Conflicts Committee accepted the January 24 offer and recommended approval of the Merger to the Regency board.[15] In that meeting, J.P. Morgan gave a verbal fairness opinion to the Conflicts Committee that the proposed terms of the Merger were fair to Regency's common unitholders.[16] Later on January 25, after receiving the recommendation of the Conflicts Committee and discussing the proposed transaction with J.P. Morgan, the Regency board approved the proposed Merger.[17]

On February 18, 2015, the parties agreed to amend the terms of the Merger to replace the cash component with additional ETP units, based on the volume-

---

[10] *Id.* Ex. 8.

[11] *Id.* Ex 7, at 1.

[12] Mackintosh Aff. ("Mackintosh Aff. III") Ex. 17, at 3-4 (Dkt. 222).

[13] Proxy at 56.

[14] *Id.*

[15] *Id.* at 57; Potts Aff. I Ex. 16, at 2.

[16] Potts Aff. I Ex. 16, at 1-2.

[17] *Id.* Ex. 19, at 1-3.

weighted average price of ETP units for the five trading days preceding the closing of the Merger.[18]

On March 24, 2015, Regency issued a definitive proxy statement (the "Proxy") in advance of a special meeting of Regency unitholders to consider and vote on whether or not to approve the Merger.[19] On April 28, 2015, a majority of Regency's unitholders voted to approve the Merger, which closed on April 30, 2015.[20] At closing, each Regency common unit was converted into 0.4124 units of ETP.[21] No appraisal rights were available in connection with the Merger.[22]

## II.    PROCEDURAL POSTURE

On June 10, 2015, Dieckman filed his original complaint in this case, asserting four claims for relief on behalf of a class of Regency common unitholders as of the date of the Merger. On March 29, 2016, the court issued a memorandum opinion and dismissed all four claims based primarily on application of the Unitholder Approval safe harbor in the LP Agreement.[23]

---

[18] Proxy at 59; Mackintosh Aff. III Ex. 20, at 4-6.

[19] Proxy at 44.

[20] Potts Aff. I Ex. 27, Item 5.07; *Id.* Ex. 28, Item 2.01.

[21] Mackintosh Aff. II Ex. 52, at 1.

[22] Proxy at 79.

[23] *Dieckman*, 2016 WL 1223348, at *1.

On January 20, 2017, the Delaware Supreme Court reversed this court's dismissal decision. It concluded that Dieckman had pled sufficient facts that the Unitholder Approval safe harbor was not satisfied because the General Partner "allegedly made false and misleading statements to secure" that approval, and that the Special Approval safe harbor was not satisfied because the General Partner "allegedly used a conflicted Conflicts Committee."[24]

On May 5, 2017, Dieckman filed an amended complaint, asserting four claims. Count I asserted that the General Partner breached Section 7.9(b) of the LP Agreement by approving the Merger even though the members of the Regency board did not believe that the Merger was in the best interests of Regency. Count II asserted that the General Partner breached the implied covenant of good faith and fair dealing by approving the Merger. Count III asserted that all the other defendants aided and abetted a breach of the LP Agreement. Count IV asserted that all the other defendants had tortiously interfered with the LP Agreement.

On May 19, 2017, defendants filed a motion to dismiss the amended complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[25] On February 20, 2018, the court issued an order granting in part and denying

---

[24] *Dieckman*, 155 A.3d at 361.

[25] Dkt. 69.

10

in part that motion.[26]  Specifically, the court denied defendants' motion to dismiss Count I and granted the motion with respect to Count II, insofar as it pertained to Section 7.9(b), and Counts III and IV.[27]

On May 14, 2019, the parties filed the pending cross-motions for summary judgment.[28]

## III.  ANALYSIS

Under Court of Chancery Rule 56(c), this court "shall" enter summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[29]  Under Rule 56(e), "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's

---

[26] *Dieckman*, 2018 WL 1006558.

[27] *Id.* ¶¶ 2-12.  On September 19, 2019, the court entered an order clarifying that "Count II was not dismissed insofar as it may pertain to advancing implied covenant arguments with respect to Section 7.9(a) and Section 7.10(b) of the Regency limited partnership agreement."  Dkt. 255 ¶ 1.

[28] Dkt. 209; Dkt. 210; Dkt. 211; Dkt. 212.

[29] Ch. Ct. R. 56(c).

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."[30]

## A. There is a Genuine Issue of Material Fact Concerning Whether the Conflicts Committee or the Regency Board Relied on J.P. Morgan's Fairness Opinion

Defendants seek summary judgment in their favor on Count I of the amended complaint based on the application of Section 7.10(b) of the LP Agreement. That provision states in relevant part that an act the General Partner takes in reasonable reliance upon the opinion of an investment banker shall be conclusively presumed to have been done in good faith:

> The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.[31]

According to defendants, because the Conflicts Committee and the Regency board relied on a fairness opinion J.P. Morgan provided in connection with the Merger, the General Partner fulfilled the requirements of Section 7.10(b) and "must be presumed

---

[30] Ch. Ct. R. 56(e).

[31] LP Agreement § 7.10(b).

12

to have acted in good faith in approving the Merger," thus barring Dieckman's claim for breach of the LP Agreement.[32]

Dieckman does not dispute that the Conflicts Committee consulted with J.P. Morgan concerning the proposed Merger or that J.P. Morgan was qualified to render a fairness opinion as a general matter.[33] Dieckman's opposition focuses instead on two issues. The first raises a legal question—does Section 7.10(b) apply to a conflicted transaction like the Merger? The second is a fact question—did the General Partner (through the Conflicts Committee and, in turn, the Regency board) actually rely on J.P. Morgan's fairness opinion?

With respect to the first issue, Dieckman argues that Section 7.10(b)—which appears in a section of the LP Agreement (Section 7.10) entitled "Other Matters Concerning the General Partner"—was not intended to apply to conflicted transactions given that the LP Agreement has another provision (Section 7.9) specifically dedicated to "Resolution of Conflicts of Interest; Standards of Conduct

---

[32] Defs.' Opening Br. 2.

[33] Dieckman does contend that "there is a factual dispute as to whether the Conflicts Committee could have reasonably believed that any fairness opinion provided by the J.P. Morgan team . . . was within their professional competence" given the constraints under which it worked, including the fact that it "was brought in four days into a nine-day process" to render a fairness opinion on an $11 billion merger "without a data room in a matter of days." Pl.'s Opp'n Br. 44-45. The court need not address this issue given its conclusion that there is a genuine issue of material fact concerning whether the General Partner relied on J.P. Morgan's fairness opinion.

13

and Modification of Duties."[34]  In support of this argument, Dieckman relies heavily on Vice Chancellor Glasscock's decision in *Morris v. Spectra Energy Partners (DE) GP, LP,* which analyzed two provisions similar to Sections 7.9(a) and 7.10(b) of the LP Agreement.[35]

Like this case, *Spectra* involved a master limited partnership in an energy business that had engaged in a conflicted transaction.  Defendants argued for dismissal of certain claims based on the conclusive presumption of good faith in Section 7.10(b) of the Spectra agreement because the conflicts committee allegedly relied on a financial advisor in approving the transaction.  Applying the specific-over-the-general rule of contract interpretation,[36] the court declined to apply the conclusive presumption in Section 7.10(b) and opted instead to apply the "rebuttable good faith presumption" in Section 7.9(a) of the Spectra agreement after carefully considering the structure and plain language of the agreement and after determining there was "no binding authority" requiring it to apply the conclusive presumption.[37]

---

[34] The LP Agreement does not contain any provision indicating that headings and subheadings in the agreement may not be used to describe or define the meaning of provisions of the LP Agreement.

[35] 2017 WL 2774559 (Del. Ch. June 27, 2017).  In fact, Section 7.10(b) of the provision at issue in *Spectra* is identical to the one in the LP Agreement here.  *See id.* at *7.

[36] *See DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("[W]here specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[37] *Spectra*, 2017 WL 2774559, at *10-12.

In distinguishing one of the authorities on which defendants relied heavily, the court further explained "that when sophisticated parties intend to provide a conclusive presumption in a conflicts situation, they know how to draft such a provision."[38]

Although the court finds the analysis in *Spectra* to be persuasive, examining the interplay of MLP provisions like Sections 7.9(a) and 7.10(b) of LP Agreement is a nuanced endeavor best done only when necessary.[39] Here, it is not necessary for the court to do so because a genuine issue of fact exists that would preclude entry of summary judgment in defendants' favor in any event based on Section 7.10(b). The court turns to that issue next.

In support of their contention that the Conflicts Committee relied on a fairness opinion from J.P. Morgan, defendants cite to minutes of a Conflicts Committee meeting held on January 25, 2015. Those minutes reflect that the Conflicts Committee approved the proposed Merger and recommended it to the Regency board after receiving an oral opinion from J.P. Morgan that "the aggregate consideration comprised of (i) 0.4066 ETP units for each Partnership unit and (ii) $0.32 cash per Partnership unit was, from a financial point of view, fair to the

---

[38] *Id.* at *12 (distinguishing *Employees Ret. Sys. of St. Louis v. TC Pipelines GP, Inc.*, 2016 WL 2859790 (Del. Ch. May 11, 2016), *aff'd*, 152 A.3d 1248 (Del. 2016)).

[39] It also is possible, albeit unlikely given the nature of an MLP agreement, that trial would elicit parol evidence relevant to resolving any ambiguities concerning the interplay between Sections 7.9(a) and 7.10(b).

unaffiliated holders of common units of the Partnership."[40] In support of their contention that the Regency board relied on the same opinion, defendants cite to minutes of a Regency board meeting held later that day reflecting that the board approved the Merger after a representative of J.P. Morgan discussed its "analysis used in connection with rendering its fairness opinion regarding the proposed merger."[41]

In response, Dieckman has provided evidence suggesting that the Conflicts Committee determined several days before J.P. Morgan issued its oral fairness opinion on January 25, that the Merger was fair to the unitholders on terms *less favorable* than the terms on which J.P. Morgan provided its fairness opinion. In particular, the minutes of a January 22 meeting of the Conflicts Committee reflect that the Conflicts Committee "determined that it believed the financial terms of the Potential Transaction were fair to the unaffiliated unitholders of the Partnership."[42]

---

[40] Potts Aff. I Ex. 16, at RGP-CC-SUB-00004039; *see also id.* Ex. 18 (Brannon Aff.) ¶ 6 (attesting that the "Conflicts Committee relied on JP Morgan's fairness opinion . . . in approving the Merger and determining to recommend it to the Regency Board").

[41] *Id.* Ex. 19 at 1. Defendants also cite deposition testimony from two directors (Bradley and Gray) who were not on the Conflicts Committee. Bradley testified in general terms that "the board relied on the conflict committee's review, evaluation and negotiation . . . [i]ncluding by its advisors of JP Morgan and Akin Gump." *See id.* Ex. 20 (Bradley Dep.), at 63-64. Gray testified that JP Morgan's presentation at the January 25 board meeting "was consistent with what [he] was seeing from the historical financial performance and what [he] was seeing in the industry" and that he reviewed a package of board materials before approving the Merger on January 25. *See id.* Ex. 21 (Gray Dep.), at 207-08, 210-11.

[42] Mackintosh Aff. III Ex. 17, at 3.

16

At that time, the proposal on the table consisted of an exchange ratio of 0.4044 ETP common units and a cash payment of $0.36 per common unit of Regency.[43] According to a preliminary financial analysis by J.P. Morgan, the implied value of those terms as of January 22 was $26.27 per Regency unit.[44]  The proposal on the table as of January 25, however, was higher than the January 22 proposal.  It consisted of an exchange ratio of 0.4066 and a cash payment of $0.32 per common unit of Regency that, according to a financial analysis prepared by J.P. Morgan on January 24, had an implied value of the $26.89 per Regency unit.[45]

Dieckman points to deposition testimony of both members of the Conflicts Committee corroborating what its January 22 meeting minutes say.  Specifically, when Brannon was asked whether "the proposal ETP made as of January 22 was already acceptable," he replied:  "Taking everything as a whole, yes."[46]  Bryant testified similarly, affirming that "as of January 22nd, 2015, the [Conflicts Committee] had determined that it believed the financial terms of the potential transaction were fair to the . . . unaffiliated [unitholders]."[47]

---

[43] *Id.*; Potts Aff. I Ex. 6 (ETP board presentation), at 11.

[44] Potts Aff. I Ex. 12, at 9.

[45] *Id.* Ex. 15, at 1.

[46] Mackintosh Aff. III Ex. 4 (Brannon Dep.), at 147-48.

[47] *Id.* Ex. 5 (Bryant Dep.), at 194-95.

As evidence that the Regency board also did not rely on J.P. Morgan's fairness opinion, Dieckman points to the deposition of director Rodney Gray, who was not on the Conflicts Committee. Gray agreed that the Regency board did not base its conclusion to approve the Merger on any "separate board process apart from the conflict committee's process."[48]

Based on the evidence of record just discussed, Dieckman has demonstrated in my opinion that there is a genuine issue of fact about whether defendants *actually* relied on J.P. Morgan's January 25 fairness opinion. To be clear, it is open for debate whether the Conflicts Committee relied on J.P. Morgan's fairness opinion when it approved the January 25 terms given the evidence that the Conflicts Committee already had determined that the inferior January 22 terms were fair. This fact dispute is material because Section 7.10(b), by its plain terms, only applies if the act in question was "taken in reliance upon" the professional opinion.[49]

---

[48] *Id.* Ex. 7 (Gray Dep.), at 189-90.

[49] Relying on in *In re Encore Energy Partners LP Unitholder Litig.*, 2012 WL 3792997 (Del. Ch. Aug. 31, 2012), defendants argue that the "fact that directors form their own opinions of a transaction does not negate their reliance on a financial advisor, so long as the fairness opinion is still a factor supporting their final vote on a transaction." Defs.' Reply Br. 10-11. *Encore* bears no resemblance to this case. It did not involve a provision like Section 7.10(b) of LP Agreement that, if satisfied, could trigger a conclusive presumption of good faith. The issue in *Encore* was whether plaintiffs had pled facts from which one could infer that a conflicts committee had approved a transaction in bad faith. 2012 WL 3792997 at *11. In conducting that analysis, the court noted that the conflicts committee had "relied on the advice of . . . a competent financial advisor" before approving the merger agreement but, unlike here, it was not alleged that the offer on which the

18

Dieckman further argues that the Conflicts Committee could not have relied on the J.P. Morgan's fairness opinion because the Merger consideration changed after J.P. Morgan provided its opinion on January 25. As discussed above, as of January 25, the Merger consideration consisted of 0.4066 ETP units and $0.32 cash per Regency unit.[50] On February 18, 2015, the cash component was replaced with additional ETP units.[51] J.P. Morgan, however, never updated its fairness opinion to reflect this change in consideration.[52] Thus, even if the Conflicts Committee did rely on the J.P. Morgan fairness opinion as of January 25, the committee nevertheless did not rely on any updated fairness opinion for the final deal terms.

Defendants assert that the fact that J.P. Morgan did not update its fairness opinion does not matter because the change in the Merger consideration was immaterial. Whether the change in the terms from January 25 to February 18 was material, however, is a fact question appropriate for trial, especially given that the value of the proposal could fluctuate since the exchange ratio did not have a collar.[53]

* * * * *

---

financial advisor opined was higher than an offer that the conflicts committee already decided was fair. *Id.*

[50] Potts Aff. I Ex. 17, at 1.

[51] Proxy at 59.

[52] Mackintosh Aff. III Ex. 4 (Brannon Dep.), at 186-88.

[53] *Id.* Ex. 5 (Bryant Dep.), at 196.

For the reasons explained above, defendants' motion for summary judgment based on the application of Section 7.10(b) of the LP Agreement is denied.

**B.    There Is No Genuine Dispute That the Conflicts Committee Was Not Validly Constituted, Precluding Application of the Special Approval Safe Harbor**

Dieckman seeks partial summary judgment that the General Partner did not obtain a "Special Approval" for the Merger on the theory that the Conflicts Committee was not validly constituted. Specifically, Dieckman argues that there was no Special Approval because Brannon was still serving on the board of an "Affiliate" of Regency (Sunoco) when he joined the Conflicts Committee of the Regency board, which is prohibited under the LP Agreement.

As mentioned above, Section 7.9(a) of the LP Agreement provides that an action of the General Partner with respect to a conflicted transaction "shall not constitute a breach" of the LP Agreement "or of any duty stated or implied by law or equity" if the requirements of one of four safe harbors is satisfied. The safe harbor relevant here is whether the transaction was "approved by Special Approval."[54]

The LP Agreement defines "Special Approval" to mean "approval by a majority of the members of the Conflicts Committee."[55] The definition of the term "Conflicts Committee" (quoted below), in turn, provides that none of its members

---

[54] LP Agreement § 7.9(a).

[55] *Id.* § 1.1 at A-13.

20

can simultaneously be a director of the General Partner and serve on the board of an "Affiliate" of the General Partner:

> [A] *committee of the Board of Directors of the General Partner composed entirely of two or more directors who are not* (a) security holders, officers or employees of the General Partner, (b) officers, *directors* or employees *of any Affiliate of the General Partner* or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.[56]

"Affiliate" is defined in the LP Agreement to mean "with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question."[57]  Our Supreme Court held that the LP Agreement in this case "is reasonably read by unitholders to imply a condition that a Committee has been established whose members genuinely qualified as unaffiliated with the General Partner and independent *at all relevant times*."[58]

---

[56] *Id*. at A-5 (emphasis added).

[57] *Id*. at A-2.  The term "Person" is defined broadly to mean "an individual or a corporation, firm, limited liability company, partnership, joint venture, trust, unincorporated organization, association, government agency, or political subdivision thereof or other entity."  *Id.* at A-12.

[58] *Dieckman*, 155 A.3d at 369 (emphasis added).

Defendants do not dispute that Sunoco was an Affiliate of the General Partner of Regency when the Conflicts Committee was considering whether to approve the Merger. Nor could they. As defendants acknowledge, Sunoco was "an affiliate of Regency . . . since September 2014," when ETP—which was controlled by ETE—acquired 100% of Sunoco's general partner.[59] In simplified terms, Sunoco and Regency were both controlled by or under the control of ETE through various intermediaries.[60] It also is not disputed that Brannon, who joined the Sunoco board on September 8, 2014,[61] did not resign from the Sunoco board until January 20, 2015 at the earliest.[62]

Dieckman contends that Brannon served simultaneously on the Conflicts Committee and the Sunoco board because he was added to the Conflicts Committee effective January 16, 2015, while he was still a Sunoco director.[63] For support,

---

[59] Defs.' Opp'n Br. 10 n.26 (citing Sunoco LP 2014 10-K).

[60] *See supra* I.A (chart depicting ownership relationships among the relevant entities before the Merger).

[61] Mackintosh Aff. I Ex. 6, at 2; *Id.* Ex. 21 (Brannon Dep.), at 35-36.

[62] *See* Defs.' Opp'n Br. 34 ("Brannon [e]ffectively [r]esigned from the Sunoco Board on January 20, 2015 before [j]oining the Conflicts Committee"). As noted below, Dieckman contends that Brannon did not resign from the Sunoco board until January 26, 2015.

[63] Dieckman also argues that Brannon served simultaneously on the Conflicts Committee and the Sunoco board because (1) he "acted in his capacity as a Conflicts Committee member" when Brannon "was indisputably a Sunoco director" and (2) Brannon did not resign from the Sunoco board before January 26, 2015, which indisputably was after he joined the Conflicts Committee. Pl's Opening Br. 29-32. Because Dieckman's first argument, discussed above, is dispositive, the court does not reach these issues.

22

Dieckman relies on a written consent of the General Partner dated January 16, 2015 (the "January 16 Consent").[64] The January 16 Consent resolves "that, effective as of the date hereof, Mr. Brannon be, and hereby is, appointed as a director of the" General Partner, "as a member of the Audit & Risk Committee and as the Conflicts Chair," which is defined to mean the "chairman of the conflicts committee . . . of the Board."[65]

The Regency board approved the January 16 Consent the day after it held a special telephonic meeting on January 16, 2015. The minutes of that meeting state that "Richard D. Brannon would be nominated to the Board by ETE and would be added to both the Audit & Risk Committee and the Conflicts Committee" and that the Conflicts Committee, comprised of Brannon and Bryant, "would evaluate the proposal" to merge Regency into ETP and to "report back to the full Board with their recommendation."[66] The board minutes further state that, after discussion, the Regency board "unanimously approved tasking" the Conflicts Committee to evaluate this proposal and to report back to the full Regency board.[67]

The next day, on January 17, Jaclyn Thompson, Regency's Corporate Counsel, circulated the January 16 Consent to the directors by email, stating:

---

[64] Mackintosh Aff. II Ex. 40, at 1.

[65] *Id*. at 1, 2.

[66] Mackintosh Aff. II Ex. 44, at 1.

[67] *Id.* at 2.

23

"attached for your review and approval is a board consent acknowledging Dick Brannon's independence and appointing him as a director of the board, member of the audit & risk committee and chair of the conflicts committee."[68] Thompson's email asked the directors to "let us know by response to this email" if they approved the January 16 Consent.[69] Four of the five members on the Regency board expressed their approval by reply email that day, on January 17, 2015.[70]

Based on the face of the January 16 Consent and the undisputed fact that Brannon did not leave the Sunoco board before January 20, the Conflicts Committee was not validly constituted because Brannon served simultaneously on the Conflicts Committee and Sunoco's board from January 16 to at least January 20. During this five-day period, on January 19, 2015, Brannon participated in a conference call with the other member of the Conflicts Committee (Bryant), Regency management, and the Conflict Committee's counsel (Akin Gump) to discuss "the timeframe if we were moving forward with the transaction."[71] The dial-in instructions for the

---

[68] *Id.* Ex. 40, at ET-00035940.

[69] *Id.*

[70] Mackintosh Aff. I Ex. 37; Mackintosh Aff. II Exs. 38, 39. The Delaware Limited Liability Company Act provides that "[u]nless otherwise provided in a limited liability company agreement," an action may be approved by consent "by managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all managers entitled to vote thereon were present and voted." 6 *Del. C.* § 18-404(d). No argument has been advanced that the January 16 Consent did not receive the necessary number of votes to make it effective.

[71] Mackintosh Aff. I Ex. 21 (Brannon Dep.), at 86-89.

24

teleconference describe the subject of the call as "Conflicts Committee - Conference Call."[72] Also on January 19, after the conference call, Regency's General Counsel emailed Brannon and Bryant a draft of the merger agreement.[73]

In response to this evidence, defendants contend that "the context surrounding" the January 16 Consent indicates that "it was sent in error, did not reflect the Regency Board's intent, and was superseded and rescinded by a subsequent resolution adding Brannon to the Conflicts Committee as of January 20, 2015 [the "January 20 Consent"]—after he submitted his resignation from the Sunoco Board."[74] The January 20 Consent states "that, effective as of the date hereof, Mr. Brannon be, and hereby is, appointed as a member of the Audit & Risk Committee and as the Conflicts Chair."[75]

Defendants argue that the "logical inference from the adoption of a second resolution only a few days later covering the same subject matter is that the first resolution did not accurately reflect the Regency Board's intent and was superseded."[76] In support of this theory, defendants rely on this court's decisions in

---

[72] Mackintosh Aff. II Ex. 42.

[73] *Id.* Ex. 43.

[74] Defs.' Opp'n Br. 30.

[75] Potts Aff. ("Potts Aff. II") Ex. 22, at 1 (Dkt. 226).

[76] Defs.' Opp'n Br. 30.

*Glassco v. County Council of Sussex County*[77] and *Barsky v. Flaherty*.[78] Both of these cases are readily distinguishable because they each involved resolutions that the court found to have revoked earlier *inconsistent* actions.

In *Glassco*, for example, plaintiffs challenged a 1986 resolution that conflicted with a 1985 moratorium that prohibited rezoning in Sussex County.[79] The court concluded that "as a matter of fact" the Sussex County Council "did enact the [1986 resolution] and that that resolution revoked the [1985 moratorium] . . . based upon the plain language of the 1986 resolution" because the resolution explicitly stated that it would "remove all existing moratoriums."[80]

Similarly, in the context of a motion for a preliminary injunction, the court in *Barsky* rejected the argument that a resolution authorizing a spin-off was a contractually enforceable dividend in part because "the Board appear[ed] to have rescinded the resolution by its later resolutions . . . determining not to conduct the spin-off."[81] As defendants themselves point out, the later resolutions "indicated contrary intent."[82]

---

[77] 1993 WL 50287 (Del. Ch. Feb. 19, 1993).

[78] 1987 WL 33981 (Del. Ch. Dec. 30, 1987).

[79] 1993 WL 50287, at *4.

[80] *Id*. at *4-5.

[81] 1987 WL 33981, at *7.

[82] Defs.' Opp'n Br. 32.

Here, in contrast to *Glassco* and *Barsky*, the January 16 Consent and the January 20 Consent evince the same intent—to put Brannon on the Conflicts Committee. Indeed, the language in the two consents describing Brannon's appointment to the Conflicts Committee is identical.[83]

The two consents do differ in one respect that is irrelevant to Brannon, *i.e.*, the January 16 Consent adds a third director (Matthew Ramsey) to the Conflicts Committee but the January 20 Consent does not.[84] This difference suggests that appointing Ramsey to the Conflicts Committee may have been a mistake or perhaps that it was decided later to remove him from that position.[85] But nothing in the text of the January 20 Consent indicates that Brannon's appointment to the Conflicts Committee via the January 16 Consent was a mistake. There is no language in the January 20 Consent, for example, that purports to revoke or supersede the January 16 Consent insofar as Brannon's appointment to the Conflicts Committee is concerned.

---

[83] *Compare* Mackintosh Aff. II Ex. 40, at 2 ("[E]ffective as of the date hereof, Mr. Brannon be, and hereby is, appointed as . . . the Conflicts Chair . . . .") *with* Potts Aff. II Ex. 22, at 1 ("[E]ffective as of the date hereof, Mr. Brannon be, and hereby is, appointed as . . . the Conflicts Chair . . . .").

[84] *See* Mackintosh Aff. II Ex. 40, at 1-4; Potts Aff. II Ex. 22, at 1.

[85] In her January 17 email forwarding the January 16 Consent to the Regency board members, Thompson stated that "[t]he consent also appoints Matt [Ramsey] as the third member of the conflicts committee and chairman of the audit & risk committee." Mackintosh Aff. II Ex. 40, at ET-0003940.

In a footnote to their brief, defendants assert they "are confident that the evidence adduced at trial would demonstrate that the January [16 Consent] was circulated in error and did not accurately reflect the Regency Board's intent."[86] This assertion is unsupported by any *evidence*, however, and thus is legally insufficient to defeat Dieckman's summary judgment motion.

Under well-established Delaware law, "the moving party initially bears the burden of showing that" no genuine issue of material fact exists.[87] But "[w]hen a motion for summary judgment is supported by such a showing . . . the burden shifts to a non-moving party to demonstrate that there are material issues of fact."[88] This longstanding requirement of our law is embedded in this court's rules. Under Court of Chancery Rule 56(e), "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." [89] Rather, "the adverse party's response, *by affidavits or as otherwise provided by in this rule, must set forth specific facts showing that there is a genuine issue for trial*."[90] "If the adverse party does not so

---

[86] Defs.' Opp'n Br. 30 n.82.

[87] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[88] *Id.* at 681 (internal quotations omitted); *see also Grabowski v. Mangler*, 938 A.2d 637, 641 (Del. 2007) (citing *Moore*, 405 A.2d at 681).

[89] Ch. Ct. R. 56(e).

[90] *Id.* (emphasis added).

28

respond, summary judgment, if appropriate, *shall* be entered against the adverse party."[91]

Critically, defendants have produced no *evidence* demonstrating that Brannon was not on the Conflicts Committee effective January 16, 2015 as a result of the January 16 Consent. In fact, although defendants submitted an affidavit from Brannon in connection with the cross-motions for summary judgment, that affidavit never states or intimates that the January 16 Consent was mistaken in any respect or that it was never intended that he would begin his service on the Conflicts Committee effective January 16, 2015. Brannon's affidavit ducks the issue. It states, elliptically, that he "served on the Conflicts Committee of the Board of Regency's general partner" without providing any precision concerning when that service began.[92]

Defendants also have not provided any affidavit or deposition testimony from any of the members of the Regency board who approved the January 16 Consent attesting that it was not their intention to appoint Brannon to the Conflicts Committee effective January 16. Nor have they provided such evidence from any other person who presumably would know whether, as defendants contend, the January 16 Consent "was sent in error." An obvious source for this information

---

[91] *Id.* (emphasis added).

[92] *See* Potts Aff. I Ex. 18 (Brannon Aff.) ¶ 3.

would be the in-house counsel (Jaclyn Thompson) who circulated the January 16 Consent to the members of Regency's board on January 17 for their approval along with an explanation of what actions it was intended to effectuate. Yet defendants have not submitted any affidavit or deposition testimony from Thompson to oppose Dieckman's summary judgment motion. Nor have they submitted an affidavit under Rule 56(f) contending that they "cannot for the reasons stated present by affidavit facts essential to justify [their] opposition" to the motion.

For the reasons explained above, based on the evidence Dieckman has brought forth and defendants' failure to identify any contrary evidence creating a genuine issue of material fact for trial, the court finds that the Conflicts Committee was not validly constituted from its inception. Accordingly, partial summary judgment will be granted in Dieckman's favor that the Special Approval safe harbor in the LP Agreement was not satisfied in connection with the Merger.

## C. The Proxy Was Materially False and Misleading in at Least Two Respects, Precluding Application of the Unitholder Approval Safe Harbor

Dieckman also seeks partial summary judgment that the defendants could not have obtained the Unitholder Approval because "the Proxy misrepresented material facts to Regency's LP unitholders asked to vote on the Merger."[93] The court agrees.

---

[93] Pl.'s Opening Br. 4.

First, the Proxy stated that "[t]he Regency Conflicts Committee consists of *two independent* directors: Richard D. Brannon (Chairman) and James W. Bryant."[94] The implication of this representation is that, to be independent, a member of the Conflicts Committee at least must satisfy the criteria in the LP Agreement for who can serve on the Conflicts Committee. As our Supreme Court said in this case: "In deciding to approve the merger, a reasonable unitholder would have assumed based on the disclosures that the transaction was negotiated and approved by a Conflicts Committee composed of persons who were not 'affiliates' of the general partner and *who had the independent status dictated by the LP Agreement*."[95]

The representation in the Proxy that Brannon was independent was false for the reasons discussed in the previous section. To repeat, Brannon was not independent because he did not satisfy the criteria for serving on the Conflicts Committee due to his simultaneous service on the Conflicts Committee and on the board of an Affiliate of the General Partner (Sunoco). This occurred for at least four (and perhaps all)[96] of the ten days from the date of his appointment to the Conflicts Committee on January 16, until the Conflicts Committee approved the Merger on

---

[94] Proxy at 60 (emphasis added).

[95] *Dieckman*, 155 A.3d at 369 (emphasis added).

[96] As previously noted, Dieckman contends that Brannon did not resign from the Sunoco board before January 26, 2015. Pl.'s Opening Br. 29-32.

January 25. The false representation that Brannon was independent was material because it would have been important to a reasonable stockholder deciding whether or not to approve the Merger to know that one of the two individuals entrusted to negotiate the terms of a conflicted transaction was not independent within the terms of the LP Agreement.

Second, the Proxy stated that the Conflicts Committee's approval of the Merger "constituted 'Special Approval' as defined in the Regency partnership agreement."[97] The falsity and materiality of this representation flows from Brannon's lack of independence. The representation was false because there was no Special Approval since the Conflicts Committee was not validly constituted. And it was material because it would have been important to a reasonable unitholder to know that a form of protection (*i.e.*, a "Special Approval") in the LP Agreement that was featured in the Proxy to reassure unitholders that the proposed merger was the product of arm's-length bargaining actually was not satisfied.

Our Supreme Court previously explained that "implied in the language of the LP Agreement's conflict resolution provision is a requirement that the General Partner not act to undermine the protections afforded unitholders in the safe harbor process."[98] The high court further explained that "[i]mplicit in the express terms is

[97] Proxy at 60-61.
[98] 155 A.3d at 368.

that the [Conflicts] Committee membership be genuinely comprised of qualified members and that deceptive conduct not be used to create the false appearance of an unaffiliated, independent [Conflicts] Committee."[99] And, with respect to the Unitholder Approval safe harbor in particular, the high court held that once the General Partner "issued a 165-page proxy statement to induce the unaffiliated unitholders not only to approve the merger transaction, but also to secure the Unaffiliated Unitholder Approval safe harbor, implied in the language of the LP Agreement's conflict resolution provision was an obligation not to mislead unitholders."[100]

Here, Dieckman has demonstrated that the Proxy misrepresented material facts that undermine an important safe harbor protection in the LP Agreement. For this reason, Dieckman is entitled to summary judgment that the Unitholder Approval safe harbor in the LP Agreement was not satisfied in connection with the Merger.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied, and Dieckman's motion for partial summary judgment is granted. The parties are directed to confer and to submit an order to implement this decision within five business days.

---

[99] *Id*. at 369.

[100] *Id*. at 368.