# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LPPAS REPRESENTATIVE, LLC, in
its capacity as authorized agent and
representative of Luis Perez, Gerardo
Necuze, and Manuel Enriquez,

        Plaintiff,

        v.

ATH HOLDING COMPANY, LLC,
and HIGHLAND ACQUISITION
HOLDINGS, LLC,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0241-KSJM

## ORDER RESOLVING CLAIM FOR FEE SHIFTING

1.    As described more fully in the Memorandum Opinion dated December 29, 2020, the defendant-buyers sought indemnification for alleged breaches of the plaintiff-sellers' representations and warranties contained in a merger agreement.[1]  The buyer's indemnification claims were secured by an escrow fund that was designed to diminish annually through four automatic distributions, excepting from these distributions pending indemnification claims that reached a certain materiality threshold.  The buyer's parent instructed the escrow agent not to release the third distribution, asserting that it had pending indemnification claims that exceeded the materiality threshold when aggregated.  The sellers disputed this assertion and filed two actions to compel the defendants to instruct the escrow agent to release the funds.  The defendants eventually chose to release the disputed

---

[1] *See LPPAS Representative, LLC v. ATH Hldg. Co.*, 2020 WL 7706937, at *1 (Del. Ch. Dec. 29, 2020).  Capitalized terms not defined herein shall have the meaning ascribed to them in the Memorandum Opinion.

funds. The plaintiffs continued to press their claim for contractual fee shifting, and this Order resolves that claim.

2. The transactional background is that, in November 2016, Defendant Highland Acquisition Holdings, LLC ("Highland") acquired two groups of Florida-based entities, the Pasteur Entities and HealthSun Entities (collectively, the "Entities"), from their respective sellers pursuant to the Purchase Agreement. The Entities operate as an integrated health plan, medical center network, and pharmacy. Defendant ATH Holding Company, LLC ("Anthem") acquired Highland in 2017 and now owns the Entities.

3. Under the Purchase Agreement, the sellers agreed to indemnify the buyers for losses arising from breaches or inaccuracies in the sellers' representations or warranties. The representations and warranties at issue are classified in the Purchase Agreement as "Specified Health Care Representations and Warranties," under which the sellers represented that the Entities had complied in all material respects with certain healthcare laws.[2] As security for and a cap on these indemnification obligations, the sellers deposited $100 million into an escrow fund, which was governed by the Escrow Agreement.[3] The Purchase Agreement incorporates the Escrow Agreement by reference.[4]

---

[2] C.A. No. 2020-0241-KSJM ("Pasteur Action") Docket ("Dkt.") 9, Transmittal Aff. of Kelly L Freund, Esq. in Supp. of Pl.'s Mot. for Summ. J. ("Freund Aff.") Ex. A. (Purchase Agreement) § 10.2(a).

[3] Freund Aff. Ex. B (Escrow Agreement) § 2(a).

[4] *See* Purchase Agreement Recitals at 3 (stating that the Purchase Agreement is contingent on the parties entering into the Escrow Agreement); *id.* § 11.16 (incorporating the recitals as material provisions); *id.* § 11.13 (incorporating all schedules and exhibits by reference); *id.* at A-19 (adopting the Escrow Agreement as a Related Agreement).

2

4. The Purchase Agreement and Escrow Agreement created a complex contractual scheme governing indemnification and the availability of the escrow fund. Section 10.2(a) of the Purchase Agreement established limits on indemnification and a materiality standard. The section provided, with respect to the Specified Representations, that "if and after the cumulative amount of Losses sustained, . . . equals or exceeds $14,675,000 in the aggregate, then . . . all such Losses shall be deemed to have satisfied . . . the terms 'material,' . . . and similar words set forth in any [Specified Representations]."[5] The third sentence of Section 10.2(a) provided that "for purposes of determining whether there has been a breach or inaccuracy" of the Specified Representations, the materiality standard applies.[6]

5. Section 6 of the Escrow Agreement provided that the escrowed funds were to be released in four tranches, one annually for four years.[7] Thus, the amount of security available for indemnifiable losses gradually decreases over time. Section 10.5 of the Purchase Agreement provided for notice of claims for indemnification. The section instructed that "[a]fter becoming aware of a claim for indemnification," a party seeking indemnification "may give notice . . . of such claim and, if known, the amount the Indemnified Person believes it is entitled to receive."[8]

---

[5] Purchase Agreement § 10.2(a).

[6] *Id.*

[7] Escrow Agreement § 6.

[8] Purchase Agreement § 10.5.

6.    Section 4 of the Escrow Agreement required the escrow agent to hold back any disputed amounts upon the buyer's timely service of a properly noticed escrow claim.[9] To alert the escrow agent, the buyer was empowered to deliver written notices

> stating that it has made a claim for indemnification pursuant to . . . Section 10.3 of the Purchase Agreement . . . and specifying the amount of the Loss if known, and, if not known, Buyer's reasonable good faith estimate of the amount of the Loss . . . and stating in reasonable detail the nature of, and basis for, any such Claim.[10]

Section 10.3 of the Purchase Agreement provided that it was "[s]ubject to the provisions set forth *in this Article 10*," which included the limitations of Section 10.2(a).[11]

7.    Anthem noticed three indemnification claims prior to the 2019 release of funds, which were scheduled to be in the amount of up to $13 million minus pending indemnification claims (the "Disputed Funds").[12]  The first two claims were for $5.8 million in the aggregate.[13]  The third was for losses in connection with a DOJ investigation for an unspecified amount, which Anthem concluded "could well exceed the materiality standard ($14,675,000)."[14]  The escrow agent withheld the Disputed Funds.

---

[9] Escrow Agreement § 4.

[10] *Id.*

[11] Purchase Agreement § 10.3 (emphasis added).

[12] Escrow Agreement § 6(c).

[13] *See* C.A. No. 2020-0443-KSJM ("HealthSun Action") Dkt. 18, Answer ¶ 119.

[14] Pasteur Action Dkt. 28, Transmittal Decl. of Sara Toscano Pursuant to 10 *Del. C.* § 3927 in Supp. of Defs.' Opp'n Br. to Pl.'s Mot. for Partial Summ J. ("Toscano Decl.") Ex. 19 (Third Indemnification Notice).

8. On March 26, 2020, the DOJ filed a complaint against Anthem based on its investigation, but the complaint did not name the Entities as parties.[15] Thus, the basis for Anthem's third indemnification claim was eliminated, as it recognized.[16]

9. A representative of the Pasteur sellers (the "Pasteur Plaintiff") filed suit against Defendants on March 31, 2020, claiming that Defendants breached the Agreements by withholding the Disputed Funds and seeking specific performance, declaratory relief, and attorneys' fees.[17]

10. On April 16, 2020, Anthem sent the sellers notice of a fourth indemnification claim, which Anthem contended related back to the first indemnification claim in 2019 and could likewise be used to block the 2019 release.[18]

11. A representative for the HealthSun sellers (the "HealthSun Plaintiff") filed its own complaint on June 5, 2020, also alleging breach of contract for refusal to release the Disputed Funds and seeking contractual fee shifting.[19]

12. The Pasteur Plaintiff moved for partial summary judgment and the HealthSun Plaintiff moved for judgment on the pleadings on their respective claims. This court resolved the pending motions in the Memorandum Opinion. The court held that Plaintiffs

---

[15] Freund Aff. Ex. I.

[16] *See* Pasteur Action Dkt. 27, Defs. ATH Hldg. Co., LLC & Highland Acq. Hldgs., LLC's Opp'n to Pl's Mot. for Partial Summ. J. at 26; HealthSun Action Dkt. 43, Defs. ATH Hldg. Co., LLC & Highland Acq. Hldgs., LLC's Opp'n to S'holder Representative Servs. LLC's Mot. for J. on the Pleadings & Mot. to Dismiss at 21.

[17] *See* Pasteur Action Dkt. 1.

[18] Toscano Decl. Ex. 12 (Fourth Indemnification Notice).

[19] *See* HealthSun Action Dkt. 1.

were entitled to judgment in their favor on whether Anthem's fourth indemnification notice "related back" to the first and on whether Anthem was required to reach the Section 10.2(a) materiality standard in order to block the release of the Disputed Funds. Therefore, the court ordered Anthem to release the difference between the $13 million in Disputed Funds and the $5.8 million in losses claimed in two of Anthem's indemnification claims.[20]

13. The court ruled that Section 10.2(a) was ambiguous as to whether Anthem's first and second claim notices totaling $5.8 million continued to meet the materiality standard without the third and fourth notices.[21] The operative question was whether the third sentence of Section 10.2(a) imposed a $14.675 million "tipping basket" that created a threshold amount that the buyer's claims must meet before it could hold back escrow funds or a "materiality scrape" that merely removed the requirement to prove materiality at $14.675 million.[22] While the court found Plaintiffs' "tipping basket" interpretation more compelling, it did not consider Anthem's "materiality scrape" reading unreasonable.[23]

14. Therefore, the court ruled that the correct interpretation required further fact-finding and denied Plaintiffs' motions as to that issue.[24] Because portions of Plaintiffs' claims were left unresolved by the Memorandum Opinion, the court denied Plaintiffs'

---

[20] *ATH*, 2020 WL 7706937, at *15.

[21] *Id.*

[22] *Id.* at *14.

[23] *Id.* at *15.

[24] *Id.*

motions as to fee shifting, finding it more efficient to wait to resolve that issue until the conclusion of this litigation.[25]

15.     The parties engaged in discovery on the unresolved issue.  On April 30, 2021, after the conclusion of document discovery, the HealthSun Plaintiff moved for summary judgment, seeking a declaration that Plaintiffs' interpretation of Section 10.2(a) was correct, an order compelling Anthem to release the remaining Disputed Funds, and an award of attorneys' fees.[26]  The Pasteur Plaintiff filed its own summary judgment motion on June 17, 2021, seeking the same relief.[27]  Discovery continued, and on June 24, 2021, Anthem deposed Brian Van Klompenberg of the law firm Kirkland & Ellis LLP, who served as deal counsel for the original buyer.[28]

16.     On July 9, 2021, in lieu of responding to the summary judgment motions, Anthem agreed to release the remaining $5.8 million in Disputed Funds.[29]  On August 23, 2021, more than a month after its summary judgment response deadline, Anthem informed Plaintiffs that, in its view, "Plaintiffs have not proved that Anthem breached the [Purchase Agreement] or any related agreement and are therefore not entitled to fees."[30]

---

[25] *Id.*

[26] *See* HealthSun Action Dkt. 70, Pl.'s Opening Br. in Supp. of its Mot. for Summ. J.

[27] *See* Pasteur Action Dkt. 65, Pl.'s Opening Br. in Supp. of its Mot. for Summ. J.

[28] *See* HealthSun Action Dkt. 106, Suppl. Transmittal Aff. of E. Wade Houston Ex. 112 ("Klompenberg Dep. Tr.").

[29] HealthSun Action Dkt. 97, Letter to the Ct. from W. Houston Ex. D.

[30] *Id.* Ex. E.

17. The parties then engaged in a brief but spirited letter-writing campaign to the court, debating the effect of Anthem's release of the Disputed Funds and Anthem's failure to respond to Plaintiffs' summary judgment briefs on Plaintiffs' fee-shifting claim.[31] The court sent a letter to the parties on September 3, 2021 canceling the hearing on the mooted summary judgment motion and ordering the parties to brief Plaintiffs' fee-shifting claim.[32] On October 20, 2021, the court held oral argument on Plaintiffs' fee-shifting claim.[33] Subsequently, the HealthSun Plaintiff and Anthem reached an agreement mooting the HealthSun Plaintiff's fee-shifting claim.[34] This Order resolves the Pasteur Plaintiff's claim.

18. Section 10.4 of the Purchase Agreement provides that the buyer shall indemnify the sellers from losses "incurred or suffered by them incident to, resulting from or in any way arising out of or in connection with any breach . . . of any covenant or agreement applicable to Buyer contained in or pursuant to this Agreement or any Related Agreement."[35] As the court noted in its Memorandum Opinion, this section does not impose a prevailing-party requirement and thus permits the sellers to recover fees on a claim-by-claim basis.[36]

19. The history of these cases has placed the court in an awkward position. All the Disputed Funds have now been released without the court ordering Anthem to do so.

---

[31] *See* Pasteur Action Dkt. 75, 76, 77; HealthSun Action Dkt. 97, 98, 99.

[32] HealthSun Action Dkt. 100.

[33] Pasteur Action Dkt. 87 & HealthSun Action Dkt. 111 ("Oral Arg. Tr.").

[34] *See* HealthSun Action Dkt. 112, Letter to the Ct. from W. Houston.

[35] Purchase Agreement § 10.4.

[36] *ATH*, 2020 WL 7706937, at *15.

8

Plaintiffs are entitled to fee shifting under the Purchase Agreement, however, if they can prove that Anthem breached the Agreements. Thus, the court must determine whether Anthem breached the Agreements by improperly instructing the escrow agent to withhold the Disputed Funds, even though the funds have now been released.

20. The first issue for the court to decide is the proper construction of Section 10.2(a)'s materiality provision, which the court found ambiguous in its Memorandum Opinion. To resolve the parties' dispute over an ambiguous provision, the court turns to the evidence submitted by the parties.

21. The drafting history favors Plaintiffs' interpretation.[37] Frederic Levenson of McDermott Will & Emery LLP served as lead deal counsel for the HealthSun sellers throughout the negotiation of the Agreements and the Pasteur sellers' deal counsel largely followed his lead.[38] As mentioned above, Klompenberg of Kirkland & Ellis LLP was his counterpart on the buyer's side.[39] Between March and August 2016, the parties exchanged

---

[37] *See Zayo Gp., LLC v. Latisys Hldgs., LLC*, 2018 WL 6177174, at *12 (Del. Ch. Nov. 26, 2018) (noting that "the drafting history of particular disputed provision(s) is often especially revealing of the process by which the parties reached a meeting of the minds and the ground on which that meeting occurred").

[38] HealthSun Action Dkt. 70, Unsworn Decl. of Frederic L. Levenson Pursuant to 10 *Del. C.* § 3927 ("Levenson Decl.") ¶¶ 3–4.

[39] *See also id.* ¶ 3.

many redlines of Section 10.2(a)[40] and at least four issue lists summarizing their main deal points, none of which contemplated the materiality scrape theory that Anthem advances.[41]

22.    To be fair, the absence of evidence on a particular point does not prove its non-existence, but the parties' contemporaneous communications cut in the same direction. For example, in an August 3, 2016 email to other McDermott attorneys, Levenson wrote that "[Kirkland] came back with the following: Materiality for RAD-V matters means $9.75 million in the aggregate for claims on a cumulative basis and not on a per claims basis (i.e., on a tipping basket basis)."[42]  Two days later, Levenson informed the Pasteur seller's counsel that "[Kirkland] agreed to $14,625,000 as the cumulative definition of materiality for the RAD-V, HCC and CMS related healthcare reps" and solicited feedback.[43]

23.    While the contemporaneous drafting history is the most reliable extrinsic evidence of the parties' intent as to the function of Section 10.2(a), Plaintiffs' position is

---

[40] *See* HealthSun Action Dkt. 70–82, Transmittal Aff. of E. Wade Houston ("Houston Aff.") Ex. 52 Pt. 6 at HSUN0002990–93 (Mar. 18, 2016); *id.* Ex. 66 Pts. 5–6 at HSUN0019490–93 (June 17, 2016); *id.* Ex. 68 Pt. 3 at HSUN0003531–34 (June 28, 2016); *id.* Ex. 72 Pt. 6 at HSUN0019028–31 (July 6, 2016); *id.* Ex. 77 Pt. 3 at HSUN0017512–16 (July 17, 2016); *id.* Ex. 88 Pt. 6 at HSUN0005341–45 (Aug. 5, 2016); *id.* Ex. 90 Pt. 2 at HSUN0006005–09 (Aug. 9, 2016); *id.* Ex. 98 Pts. 5–6 at HSUN0015109–13 (Aug. 12, 2016); *id.* Ex. 100 Pt. 3 at HSUN0013921–24 (Aug. 16, 2016).

[41] *See* Houston Aff. Ex. 58 at HSUN0018575–76 (May 22, 2016); *id.* Ex. 60 at HSUN0019609–11 (June 7, 2016); *id.* Ex. 74 at HSUN0017374 (July 15, 2016); *id.* Ex. 80 at HSUN0017242 (July 21, 2016).

[42] *Id.* Ex. 84.  In the same email, Levenson relayed that Kirkland had proposed the same materiality standard for "CMS audit matters."

[43] *Id.* Ex. 85.

further bolstered by the declaration submitted by the sellers' deal counsel and the deposition testimony of the original buyer's deal counsel. Levenson stated in his declaration that he is "familiar" with Anthem's materiality scrape argument and that it is "mistaken."[44] He declared that, when he added the $14.675 million figure to Section 10.2(a), he was implementing the parties' agreement that the buyer could recover back to the first dollar its losses for breaches of the Specified Representations that reached $14.675 million, but not recover otherwise.[45]

24. In his deposition by Anthem, Klompenberg concurred. He testified that Section 10.2(a) "was intended to set a cumulative threshold below which recovery would not be available."[46] For the purpose of determining whether a breach of the Specified Representations had occurred, "it's if and after the cumulative losses exceed the dollar threshold that it's deemed material."[47] This was because Section 10.2(a) "incorporated into the materiality scrape [the] concept of a tipping basket that . . . took the place of materiality by defining what it meant."[48] Thus, the buyer "would not have recovery for breaches of specified health care reps and warranties unless and until the cumulative losses exceeded [$]14.675 [million]."[49]

---

[44] Levenson Decl. ¶ 14.

[45] *Id.* ¶ 15.

[46] Klompenberg Dep. Tr. at 119:23–25.

[47] *Id.* at 128:11–18.

[48] *Id.* at 93:3–9.

[49] *Id.* at 152:9–12.

25. Anthem's own positions taken earlier in this litigation support Plaintiffs' reading. For example, after Anthem noticed its first indemnification claim for $5 million in June 2019, McDermott informed Anthem of its position that the claim was immaterial because "alleged breaches of the [Specified Representations] are not material unless such breaches equal or exceed $14,675,000 in the aggregate."[50] Anthem seemed to agree, noting in its second indemnification claim notice in November 2019 that its $800,000 claim "is included within the $14,675,000 aggregate materiality standard."[51] In its third indemnification claim notice, Anthem predicted that the estimated loss associated with the DOJ investigation "could well exceed the materiality standard ($14,675,000)."[52]

26. In July 2020, while opposing summary judgment, Anthem argued that the Purchase Agreement "includes a materiality threshold, but it is measured after proving 'cumulative' losses, not based on individual claims."[53] Anthem further contended that its "losses will be determined in this case, and assuming they, along with all other indemnity amounts, exceed $14,675,000, then the losses must be paid from the escrow."[54] This accord between the parties' interpretations of Section 10.2(a)'s materiality threshold appeared to change during a September 2020 hearing,[55] which Anthem later attributed to a

---

[50] HealthSun Action Dkt. 1, Verified Compl. for Specific Performance Ex. 22.

[51] *Id.* Ex. 24.

[52] *Id.* Ex. 25.

[53] Pasteur Action Dkt. 27, Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 30.

[54] *Id.* at 31.

[55] *See* Pasteur Action Dkt. 41, Oral Arg. on Pl.'s Mot. for Partial Summ. J. at 41 (Anthem arguing that opposing counsel "suggested that we kind of have an agreement on this, on how this works. And we really don't at all.").

misunderstanding, explaining that it changed its position after it "talked to transaction lawyers."[56] The court's acknowledgement of these litigation positions should not be taken as a holding under the doctrines of judicial estoppel or judicial admission, but rather as further support of a common understanding that Section 10.2(a) created a tipping basket.

27. The court finds, based on the evidentiary record, that Section 10.2(a) creates a tipping basket, as Plaintiffs submit. This result should not come as a surprise to Anthem; as Anthem's counsel noted at oral argument, the evidence was inconsistent with its position, which is why it released the remaining Disputed Funds.[57] In light of this finding, Plaintiffs are entitled to declaratory judgment that their interpretation of the Purchase Agreement is correct.

28. Given that Plaintiffs have successfully proven their reading of the Agreements, the question now is whether Anthem breached those Agreements. To prevail on a claim for breach of contract, a plaintiff must prove: "first, the existence of a contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[58] The breaching party's state of mind is not considered "in an action for contractual breach—in that sense, liability for failure to

---

[56] HealthSun Action Dkt. 56, Oral Arg. on Pl.'s Mot. for J. on the Pleadings and Mot. to Dismiss at 43.

[57] Oral Arg. Tr. at 34 (representing that "on that record, I did not want to waste time litigating an issue that I did not believe would be likely to convince Your Honor that the provision should be read the way we read it. I believe, if I was going to be successful on that, it would have had to have been as a matter of law and not when there's a record of extrinsic evidence that's not consistent with our view. So that's why we released").

[58] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

comply with a contract is strict."[59] "[L]iability for breach of contract under common law turns on a concept of strict liability and parties are held to the standard expressed in the words of the contract. If a party agrees to do something, he or she must do it or be liable for resulting damages."[60]

29. As the court held in its Memorandum Opinion, Section 4 of the Escrow Agreement authorizes the buyer to notice claims for indemnification only when they comply with Section 10.2(a)'s materiality metric for determining whether a breach of the Specified Representations has occurred.[61] Thus, Anthem was not entitled block escrow distributions under Section 4 unless the cumulative amount of indemnification claims exceeded Section 10.2(a)'s tipping basket of $14.675 million.[62]

30. Plaintiffs identify two breaches of the Escrow Agreement that they contend entitle them to fee shifting under Section 10.4. First, they argue that Anthem breached Section 4 by failing to instruct the escrow agent to release the Disputed Funds relating to the third indemnification claim after the basis for that claim evaporated. The court agrees; it held as much in its Memorandum Opinion and sees no reason to revisit the issue.[63]

---

[59] *Lacey v. Mota-Velasco*, 2021 WL 508982, at *8 (Del. Ch. Feb. 11, 2021).

[60] *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 2020 WL 7024929, at *72 (Del. Ch. Nov. 30, 2020) (alteration in original) (quoting Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 13.06, at 13–44 (2020 ed.)).

[61] *See ATH*, 2020 WL 7706937, at *11.

[62] *See id.*

[63] *Id.* at *8 n.52 (holding that "[o]nce the basis for withholding evaporated, the funds should have been released. Anthem correctly observes that the governing agreements imposed no express duty requiring Anthem to update its escrow notice so as to release funds withheld

31.     Plaintiffs' second identified breach is Anthem's decision to continue holding back the remaining $5.8 million in Disputed Funds because claims totaling that amount are insufficient under Section 10.2(a) to justify blocking escrow distributions. Defendants advance three points in response to this second argument.

32.     Defendants first respond that Section 10.2(a) "does not include an obligation that Anthem could breach."[64] This theory is inapposite; as the court held in its Memorandum Opinion, Anthem's right to block escrow distributions is dependent on its indemnification claims exceeding Section 10.2(a)'s materiality threshold, and it is the baseless assertion of that right for which Plaintiffs claim breach.[65]

33.     Defendants next respond that Anthem did not breach the Agreements because it merely exercised its contractual right to notice a claim for indemnification against the escrow under Sections 10.3 and 10.5.[66] However, the question is not whether Anthem may have a right to indemnification for the sellers' alleged breaches of the Specified Representations, but rather whether Anthem had the right to block timed distributions from the Escrow Fund. As the court held in its Memorandum Opinion, "claims that do not meet

---

on stale claims. But the agreements need not expressly state that Anthem cannot continue to deploy a defunct indemnification claim for a holdover effect after acknowledging that it is groundless, as such a provision would be 'obvious and provocative.'" (citing *Dieckman v. Regency GP LP*, 155 A.3d 358, 368 (Del. 2017))).

[64] Pasteur Action Dkt. 78 & HealthSun Action Dkt. 101, Defs.' Br. in Opp'n to Pls.' Req. for Fee-Shifting ("Defs.' Answering Br.") at 8.

[65] *See ATH*, 2020 WL 7706937, at *11.

[66] Defs.' Answering Br. at 10.

15

the Section 10.2(a) materiality standard are not lost; they are just insufficient to block scheduled disbursements of escrow funds and are thus secured by a lesser amount."[67]

34. Defendants' last respond that "advancing a reasonable position as to an ambiguous contract is not a breach."[68] Defendants seem to ground their theory in the concept of good faith, calling to mind the bad-faith exception to the common law American Rule.[69] But faith, good or bad, is irrelevant to whether Anthem violated a contractual obligation.[70] Anthem breached the Agreements by directing the escrow agent to withhold funds when it had no right to do so and assumed the risk that its proffered interpretation would be incorrect.[71] Plaintiffs incurred Losses as defined in the Purchase Agreement, including "reasonable attorneys' fees, costs, and expenses incurred in connection with . . .

---

[67] *See ATH*, 2020 WL 7706937, at *12.

[68] Defs.' Answering Br. at 11.

[69] *See generally Beck v. Atl. Coast PLC*, 868 A.2d 840, 850–51 (Del. Ch. Feb. 11, 2005) ("Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court. The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation.").

[70] The parties strenuously disagree regarding whether Anthem's position truly constituted good faith considering its shifting interpretation of Section 10.2(a) throughout this litigation, but the court need not reach the issue.

[71] *See* Oral Arg. Tr. at 44–45 (the court asking Anthem, "[i]f, however, the right to make a claim did not exist, at least not with the consequences of withholding certain staged, timed withdrawals, and your client goes in and makes the claim, knowing full well that the provision might not be as it thinks it is, might not go in their favor, isn't it part of the risk calculation your client makes, when making that claim, that it might be proven wrong, and that the claim was made in breach?").

asserting or enforcing its rights under this Agreement."[72]  Plaintiffs are entitled to recover those fees.

35.     For the foregoing reasons, Plaintiffs' motions for summary judgment are GRANTED to the extent that they are not moot.  The Pasteur Plaintiff is directed to submit a form of order implementing this holding.[73]

/s/ Kathaleen St. J. McCormick
Chancellor Kathaleen St. J. McCormick
Dated: January 10, 2022

---

[72] Purchase Agreement Ex. A at A-13.

[73] *See, e.g.*, HealthSun Action Dkt. 106, Revised [Proposed] Order Granting in Part the HealthSun Pl.'s Mot. for Summ. J.